THE STATE OF OHIO, APPELLEE, *v.* DEPEW, APPELLANT.

[Cite as State *v.* DePew (1988), 38 Ohio St. 3d 275.]

(No. 87-1334—Submitted June 14, 1988—Decided August 31, 1988.)

*John F. Holcomb,* prosecuting attorney, and *Daniel G. Eichel,* for appellee.

*Randall M. Dana,* public defender, *Randall L. Porter, Joann Bour-Stokes, Scott Jelen* and *John A. Garretson,* for appellant.

DOUGLAS, J. The instant case presents this court with numerous issues for our review and determination. For the reasons that follow, we uphold appellant's convictions and affirm the sentence of death.

In Propositions of Law I, II and III, appellant challenges the admission of his confession into evidence on the grounds that the confession was not voluntarily given, that he was denied his right to counsel, and that he had not waived his rights under *Miranda* v. *Arizona* (1966), 384 U.S. 436, 10 Ohio Misc. 9, 36 O.O. 2d 237.

In his argument on the issue of voluntariness, appellant recites the following sequence of events. He was arrested around 5:00 p.m. on April 3, 1985. Interrogation commenced at about 6:00 p.m., resulting in a confession beginning at approximately 12:45 a.m. and ending at 1:30 a.m. At 5:50 a.m., appellant signed a transcript of his oral statement. Appellant was isolated at the county prosecutor's office where those trying to assist him could not locate him. As a result of the prolonged interrogation, appellant claims he was deprived of food and sleep. Appellant further claims he was threatened that if he did not confess,

his girlfriend, Sowers, would go to prison, where "they do terrible things to young pretty girls." All these factors, appellant argues, combined to render his confession involuntary and inadmissible.

The trial court found that appellant confessed voluntarily, after he was orally advised of his *Miranda* rights. Specifically, the court found that the isolation of appellant had no unconstitutional coercive effect; that appellant's confession, as reflected in the tape recording thereof, was "casual" and "unemotional"; that appellant was told twice on the tape recording that he did not have to talk if he did not want to; that appellant sounded alert and in control on the tape, and appeared to the interrogator to be alert at the time of questioning; that appellant received food and drink during the interview; that he availed himself of restroom facilities and other accommodations; that while his confession was being typed, appellant watched television; that appellant was a thirty-one-year-old man with a high school education and possessing normal intelligence; that appellant was no novice to the criminal justice system; and that appellant had voluntarily made statements to Detective Sizemore on a prior occasion.

"In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State* v. *Edwards* (1976), 49 Ohio St. 2d 31, 3 O.O. 3d 18, 358 N.E. 2d 1051, paragraph two of the syllabus.

Clearly, the trial court was careful to consider the totality of the circumstances in its determination that appellant's confession was voluntarily given. Appellant's testimony concerning the details surrounding his confession differed substantially from the testimony of other witnesses. The record contains ample evidence supporting the factual findings by the trial court. Appellant's testimony to the contrary was obviously not believed. In reviewing a ruling on a motion to suppress, an appellate court must bear in mind that the weight of the evidence and the credibility of witnesses are for the trier of fact. *State* v. *Fanning* (1982), 1 Ohio St. 3d 19, 20, 1 OBR 57, 58, 437 N.E. 2d 583, 584. Thus, the trial court's ruling that appellant confessed voluntarily will not be disturbed.

The same conclusion must be drawn with respect to appellant's contentions that he was never advised of his *Miranda* rights and that he repeatedly, to no avail, requested a lawyer. Appellant and other witnesses testified that at the time of appellant's arrest, he told the arresting officer that he would not talk to him without a lawyer. The trial court did not accept this testimony, finding that appellant never communicated a request for a lawyer to any law enforcement officer on the day of his confession, and that if such a request was ever made, it was directed to appellant's relatives at the scene of the arrest, and the officers were not aware of the request. These findings are clearly supported by the evidence adduced at the suppression hearing.

The fact that appellant's relatives and the attorney they had contacted could not determine appellant's whereabouts after his arrest is irrelevant to the admissibility of appellant's confession. The dispositive issue is whether appellant's statement was voluntarily given with knowledge of his right to remain silent and to have an attorney

present. "The determinative factor in these cases is the *desire of the accused to consult with counsel, not the desire of counsel to consult with the accused.*" (Emphasis *sic.*) *State* v. *Carder* (1966), 9 Ohio St. 2d 1, 7, 38 O.O. 2d 1, 4, 222 N.E. 2d 620, 625. Events occurring without the knowledge of the suspect can have no bearing on his capacity to understand and knowingly relinquish a constitutional right. *Moran* v. *Burbine* (1986), 475 U.S. 412, 422. The trial court specifically found that the inability of appellant's relatives to locate him was not the result of misleading or misrepresentation by jail personnel.

Appellant next argues that his right to counsel attached at the moment of his arrest, and that any interrogation was improper after the arrest, since appellant claims to have requested a lawyer at that time. *Edwards* v. *Arizona* (1981), 451 U.S. 477. However, as noted above, the trial court found that no such request was communicated to the officers at the time of the arrest. Moreover, the right to counsel has consistently been viewed as attaching at trial, and at "critical" stages of the proceedings before trial where " 'the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or both.' " *United States* v. *Gouveia* (1984), 467 U.S. 180, 189, citing *United States* v. *Ash* (1973), 413

U.S. 300, 310. The time of appellant's arrest cannot possibly be described as a "critical" stage involving any such confrontation. *All* the evidence at the suppression hearing, including appellant's own testimony, established that there was *no* interrogation of appellant either at the time of the arrest or in the car on the way to the prosecutor's office. Mere arrest and transportation does not constitute a "confrontation" similar to a trial. Appellant's confession was properly admitted into evidence.

In Proposition of Law IV, appellant contends that the trial court erred to his prejudice by failing to require the recording of the proceedings by stenography.[1] Instead, the entire trial was tape recorded and later transcribed. Appellant asserts that since the record contains two hundred sixty-one instances of words or phrases marked "inaudible," "no audible response," or "unclear," he has been deprived of the complete record to which he is entitled for an effective appeal.

Appellant's contention that, as a defendant in a capital case, he is constitutionally entitled to a "complete, full, and unabridged transcript" is correct. *State, ex rel. Spirko,* v. *Court of Appeals* (1986), 27 Ohio St. 3d 13, 18, 27 OBR 432, 436, 501 N.E. 2d 625, 629. However, the capital defendant in

---

[1] None of the rules governing procedure in the trial courts mandates that trials, even capital trials, be recorded by stenography. Crim. R. 22 requires only that "[i]n serious offense cases all proceedings shall be recorded. * * * Proceedings may be recorded in shorthand, or stenotype, or by any other adequate mechanical, electronic or video recording device."

See, also, C.P. Sup. R. 10 (proceedings may be recorded by stenography *or* by the use of audio recording devices). However, App. R. 9(A) provides in pertinent part that

"[i]n all capital cases the trial proceedings shall include a written transcript of the record made during the trial by stenographic means." Where, as here, there is a conflict between the Appellate Rules and the rules governing procedure in the common pleas courts, the procedural rule for the trial court will prevail where the conflict relates to trial court procedure. Nevertheless, we consider recordation by stenography to be the far better approach in capital trials.

*Spirko* had been denied access to entire transcripts of hearings, such as the arraignment and hearings on motions. *Id.* at 14, 27 OBR at 433, 501 N.E. 2d at 626. Here, appellant was provided with a complete transcript of all the proceedings, which contains occasional lapses due to inaudibility. To hold that appellant has therefore been denied his right to a complete transcript would be highly unjustified unless appellant has clearly demonstrated prejudice resulting from the missing portions.

Appellant does not point out a specific instance where effective review is precluded by incompleteness of the transcript. Appellant makes only general averments that the missing information "could be vital" to his arguments. Moreover, appellant took no steps to correct the record, as he could have under App. R. 9(E),[2] by submitting to the trial court any changes he believed would better preserve his arguments for review. *State* v. *Osborne* (1976), 49 Ohio St. 2d 135, 142, 3 O.O. 3d 79, 82-83, 359 N.E. 2d 78, 84. Given the fact that appellant has not demonstrated that he was prejudiced by the alleged inadequacy of the record, this proposition of law is rejected.

In Proposition of Law V, appellant asserts that the trial court erred in overruling his motion *in limine,* filed before trial, to prevent the prosecution from calling Deborah Sowers. In that motion, appellant contended that Sowers was his common-law wife and

that her testimony was therefore subject to the spousal privilege contained in Evid. R. 601(B).

A common-law marriage is established when the following elements are shown: (1) an agreement of marriage *in praesenti;* (2) cohabitation as husband and wife; and (3) a holding out by the parties to those with whom they normally come into contact, resulting in a reputation as a married couple in the community. *Nestor* v. *Nestor* (1984), 15 Ohio St. 3d 143, 15 OBR 291, 472 N.E. 2d 1091. All these elements must be demonstrated by clear and convincing evidence. *Id.* at 146, 15 OBR at 293, 472 N.E. 2d at 1094.

A review of the record reveals numerous inconsistencies on the issue of whether the parties really considered themselves married. While they filed joint tax returns for two years and signed leases as "Rhett and Debbie DePew," on almost every other documented occasion, they represented themselves as single. For example, Deborah's three workers' compensation forms, filled out by her, reflect a single status. In his confession, appellant refers to Deborah as his "girlfriend." In filling out hospital forms in December 1984, appellant and Deborah marked "single" for marital status. Appellant admitted telling law enforcement officers on several occasions that he was single. Deborah told Sizemore that appellant was her "boyfriend." In short, the evidence is de-

---

[2] App. R. 9(E) provides:

"Correction or modification of the record. If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by

stipulation, or the trial court, either before or after the record is transmitted to the court of appeals, or the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the court of appeals."

cidedly conflicting. Under no circumstances did appellant establish a common-law marriage by clear and convincing evidence. The motion *in limine* was properly overruled.

In Proposition of Law VI, appellant contends that the trial court erred in excluding certain prospective jurors because of their views as to the death penalty.

"The proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. * * *" (Citation omitted.) *State* v. *Rogers* (1985), 17 Ohio St. 3d 174, 17 OBR 414, 478 N.E. 2d 984, paragraph three of the syllabus, vacated and remanded on other grounds (1985), 474 U.S. 1002. Appellant contends that the jurors were improperly excused since they never unequivocally stated that they could not follow the judge's instructions under any circumstances. However, this is not the standard. The prospective juror, to be properly excused, need only make it known that his views would "prevent or *substantially impair*" the performance of his duties. (Emphasis added.) *Id.* A review of the record reveals that the four prospective jurors in question each demonstrated an inability to consider death as a sentencing option. Each of the four made it sufficiently clear that his or her personal views of capital punishment would, at the very least, substantially impair his or her ability to recommend death. The determination of juror bias necessarily involves a judgment on credibility, the basis of which often will not be apparent from an appellate record. *Wainwright* v. *Witt* (1985), 469 U.S. 412, 429. For this reason, "* * * deference must be paid to the trial judge who sees and hears the juror." *Id.* at 426. The trial court's decision to exclude these four jurors is supported in the record. That ruling will not be disturbed.

Appellant argues in Proposition of Law VII that the trial court erred in commenting to the jury that any recommendation of death by the jury would be only a recommendation which would not be binding on the court. Appellant's statement that the trial judge *and* the prosecutor repeatedly informed the jury that its death penalty recommendation was "merely" a recommendation is inaccurate. The prosecution never made any such comment, and the trial judge so commented only *once*.

Appellant cites *Caldwell* v. *Mississippi* (1985), 472 U.S. 320, in support of his contention that the judge's comment was reversible error. This precise argument has been repeatedly rejected by this court on previous occasions. See, *e.g.*, *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 144, 22 OBR 203, 220, 489 N.E. 2d 795, 812-813; *State* v. *Williams* (1986), 23 Ohio St. 3d 16, 21-22, 23 OBR 13, 18-19, 490 N.E. 2d 906, 912; *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 113-114, 31 OBR 273, 275, 509 N.E. 2d 383, 387-388. See, also, *Darden* v. *Wainwright* (1986), 477 U.S. 168, 183, at fn. 15. No compelling arguments are presented by appellant which would warrant a shift in this position.

In Proposition of Law VIII, appellant contends the trial court erred in allowing gruesome, prejudicial and cumulative photographs to be admitted into evidence. Approximately seventy photographs were admitted at trial. Of these seventy, only eleven showed the bodies of the victims. Of these eleven, six were autopsy photographs, enlarged to poster size, showing front and rear views of each of the three victims.

Appellant does not focus his attention on the six autopsy photographs. Rather, appellant's argument deals almost exclusively with the sixty-four photographs of the crime scene, which appellant contends were not only repetitive, but "gruesome" as well. In regard to the photographs' not depicting bodies, appellant submits that "their content was just as horrifying and contained the same shock value as the presence of a body in the picture." As examples, appellant points to photos depicting blood-stained areas, or portions of carpet which had escaped burn damage from the fire because a body had been lying there.

We do not agree with this analysis. The photos of blood stains or fire damage to property do not have a shock value equivalent to the photograph of a corpse. The term "gruesome" in the context of photographic evidence should, in most cases, be limited to depictions of actual bodies or body parts.

As to the repetitive or cumulative nature of the sixty-four photographs, it is difficult to see how appellant could have been prejudiced by these photographs of the crime scene. "To be admissible in a capital case, the probative value of each photograph must outweigh the danger of prejudice to the defendant and, additionally, not be repetitive or cumulative in nature." *State* v. *Morales* (1987), 32 Ohio St. 3d 252, 258, 513 N.E. 2d 267, 274. In *State* v. *Thompson* (1987), 33 Ohio St. 3d 1, 9, 514 N.E. 2d 407, 416, this standard was described as the "test for admitting *gruesome* photographic evidence * * *." (Emphasis added.) While it is true that the sheer number of photographs admitted may constitute error where they are needlessly cumulative, Evid. R. 403(B), the mere fact that there are numerous photos will not be considered reversible error unless the defendant is prejudiced thereby. Ab-

sent gruesomeness or shock value, it is difficult to imagine how the sheer number of photographs admitted can result in prejudice requiring reversal. In the instant case, prejudice has clearly not been demonstrated. The overwhelming majority of photographs depict the crime scene without bodies or blood. The probative value of these photos lies in their relevance to the origin of the fire and the extent of fire damage, which would explain why no fingerprints or other physical evidence implicating appellant was recovered from the scene. As to the five photographs which contain views of a body, only two show a body in the foreground, while the other three show the body or small portions of the body. These photographs have clear probative value as they are relevant to the cause of death and are illustrative of testimony of state witnesses concerning the crime scene and the elements of the offenses charged. These photographs were kept to a minimum and their admission did not result in reversible error. We conclude that the probative value of the photographs outweighed the danger of prejudice to appellant, and that their admission into evidence was not an abuse of the trial court's discretion. *Morales, supra,* at 258, 513 N.E. 2d at 274; *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 265, 15 OBR 379, 401, 473 N.E. 2d 768, 791-792.

As to the six autopsy photographs, their content is indeed gruesome. "However, the mere fact that a photograph is gruesome or horrendous is not sufficient to render it *per se* inadmissible." *Maurer, supra,* at 265, 15 OBR at 401, 473 N.E. 2d at 791. Their probative value must outweigh the danger of prejudice, and they must not be repetitive or cumulative. The probative value of these photos is beyond dispute, as they are manifestly relevant to show cause of death and the killer's purpose

to cause death. *Id.* See, also, *State v. Martin* (1985), 19 Ohio St. 3d 122, 129, 19 OBR 330, 336, 483 N.E. 2d 1157, 1164. Again, the number of photographs was kept to an absolute minimum: two photos of each victim, showing a front and a rear view. Their probative value was substantial, while the danger of unfair prejudice, though present, was relatively limited. The enlargement of these autopsy photographs to poster size does not necessarily tip the scale toward automatic reversal. The photographs were enlarged to illustrate the testimony of the coroner, who was seated some distance from the jury. The enlargements were, therefore, not inappropriate and there is no indication that the enlargements were intended solely to inflame the jury's passions against appellant.

Lastly, appellant argues that the trial court erred in submitting all these photographs to the jury *in the penalty phase.* In his instructions at this stage, the trial judge stated that "[t]he Court is going to place in your possession the exhibits which the Court admitted into evidence during the course of both trials * * *." Citing *Thompson, supra,* appellant argues that these photographs were relevant to guilt, not to the appropriate penalty, and that permitting the jury to view the photographs again served no purpose but to inflame their passions against appellant.

Our decision in *Thompson* is being misconstrued, we assume unintentionally, as holding that the introduction of gruesome photographs in the penalty stage is reversible error. It is not. *Thompson* was meant principally to focus on the question of prosecutorial misconduct, especially the issue of commenting on a defendant's silence at any stage of the proceedings. In fact, we find that the introduction of photographs, even if gruesome, in the penalty stage is not error and is indeed authorized by R.C. 2929.03(D)(1), which provides in part that during the penalty stage, the court and the trial jury *shall* consider "* * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * *." In addition, this section provides that the court and the trial jury "* * * shall hear testimony and other evidence that is relevant to *the nature and circumstances* of the aggravating circumstances the offender was found guilty of committing * * *." (Emphasis added.)

We determine that these provisions do not preclude the introduction of photographs which are relevant to the nature and circumstances of the aggravating circumstances, and in fact authorize such introduction. Further, if additional support is needed, R.C. 2929.03(D)(1) also provides that the court and the trial jury "* * * shall hear * * * the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender.* * *" Where photographs, including gruesome photographs, relating to the nature and circumstances of the aggravating factors are not admitted in the penalty stage, a question could arise as to whether, in this second part of a bifurcated trial, it would be proper for a prosecutor to comment on such photographs.

The courts of this state have been required to wrestle with the question of what evidence is appropriate for the prosecution to introduce at the penalty stage. We now hold that, pursuant to R.C. 2929.03(D)(1), the prosecutor, at the penalty stage of a capital proceeding, may introduce "* * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * *." While this appears to permit

repetition of much or all that occurred during the guilt stage, nevertheless, a literal reading of the statute given to us by the General Assembly mandates such a result, especially in light of the prosecution's obligation to demonstrate, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation. R.C. 2929.03(D)(1).

In Proposition of Law IX, appellant contends that he was deprived of a fair trial by a remark made by the prosecutor during the pretrial hearing on Sowers' competency to testify. The dialogue in question is as follows:

"BY THE COURT: Would that be fair to the defendant in this case?

"MR. SAGE: Well I don't care what's fair to the defendant, Your Honor."

Appellant's argument is devoid of merit. The statement was obviously intemperate and seriously ill-advised, but its prejudicial effect was surely minimal. The jury was not present at this stage of the proceeding. The remark was made to the trial judge, who responded to the prosecutor's statement that "I don't care what's fair" by saying, "Well, the Court has to consider that * * *." Obviously, the court was aware of its obligation to be fair, and it should not be presumed that this single, ill-considered comment would prejudice the judge against appellant. Appellant has failed to demonstrate that this isolated remark so tainted the proceedings that appellant was deprived of a fair trial. *Steffen, supra,* at 116, 31 OBR at 277-278, 509 N.E. 2d at 389.

Appellant next argues, in Proposition of Law X, that the trial court erred in refusing to admit certain statistical evidence in the penalty stage of the trial. The evidence proffered by appellant comprised statistics regarding the number of defendants in Ohio who were charged with aggravated murder with a specification under R.C. 2929.04(A)(5) (purposeful killing of two or more persons), and the proportion of such defendants who actually received the death penalty. The trial court ruled that these statistics were irrelevant.

While it is true that the defendant in a capital case must be afforded wide latitude in presenting evidence in mitigation, R.C. 2929.03(D)(1), and it can reasonably be argued that the evidence should have been admitted pursuant to R.C. 2929.04(B)(7),[3] these requirements do not limit the authority of a court to exclude, as irrelevant, any evidence which has no bearing on the defendant's character, prior record, or the circumstances of the offense. *State v. Jenkins* (1984), 15 Ohio St. 3d 164, 189, 15 OBR 311, 333, 473 N.E. 2d 264, 289. The statistics proffered by appellant would have offered no insight whatsoever into appellant's character, his prior record, or the circumstances of his offense, but may have been relevant to whether appellant should have been sentenced to death. Here, the trial court found that such evidence would not have assisted the jury in making an individualized determination of whether the death penalty was appropriate in this particular case. We will not disturb the trial court's judgment in this regard.

In Proposition of Law XI, appellant contends that he was denied a fair trial by various instances of prosecutorial misconduct during the penalty stage.

---

[3] R.C. 2929.04(B)(7) permits the defendant to present "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death."

The first such instance occurred when the prosecution was cross-examining a defense witness, who had described appellant as "quiet, easy, outgoing." The following took place:

"Q. Did you ever see * * * [appellant] carry a large knife in his jacket or anything?

"A. No.

"Q. You knew he got cut in a knife fight over at King Kwik, didn't you?

"A. Yes, I did."

The trial court sustained defense counsel's objection to this question and offered the following curative instruction: "Ladies and gentlemen, with regard to the question and answer on the knife fight, we will strike that from the record, and the jury must reach its deliberations as if that was never presented before you and it is at this time inadmissible. Alright, you may proceed."

The misconduct of a prosecuting attorney during trial is not reversible error unless it deprives the defendant of a fair trial. *Maurer, supra,* at 266, 15 OBR at 402, 473 N.E. 2d at 793. Although the question by the prosecutor regarding the "knife fight" was improper, it was not so egregious as to require reversal. First, the question's intimation of wrongdoing by appellant was only indirect, *i.e.,* that appellant "got cut" (by someone else) in a fight involving a knife. Second, the question did have some relevance to the witness' credibility on the issue of appellant's character as peaceful. Third, the trial court promptly admonished the jury to disregard the question and the answer and to deliberate as if the question had never been asked. Generally, a reviewing court must presume that the jury followed the trial court's curative instruction. *State* v. *Ferguson* (1983), 5 Ohio St. 3d 160, 163, 5 OBR 380, 383, 450 N.E. 2d 265, 269.

Appellant also objects to a comment, made by the prosecutor during final argument in the penalty stage, in which the prosecutor stated that if appellant had taken the stand, the prosecutor would have asked him "if he's ever been convicted of a criminal offense after the date in question in this case." Defense counsel immediately objected, the jury was instructed to disregard the comment, and the defense moved for a mistrial on the basis of the reference to a subsequent conviction. This motion was overruled. Before resuming his final argument, the prosecutor apologized to the court for his comment, and stated that "I would tell the jury to disregard it; I shouldn't have said that. I wish you would just forget that because there's nothing like that here."

The remark by the prosecutor was not proper impeachment of the credibility of appellant, who had made no statement relating to his criminal history subsequent to this offense (although in his unsworn statement appellant declared that he had no criminal record *prior* to this offense). However, the prejudicial effect of the prosecutor's remark was greatly minimized not only by the curative instruction, but also by the prosecutor's apology to the jury, and by his assurance to the jury that they should forget his remark "because there's nothing like that here." By this statement, the jury was told by the prosecutor himself that no subsequent conviction had occurred. Thus, his prior comment was not so prejudicial as to require reversal. See *State* v. *Apanovitch* (1987), 33 Ohio St. 3d 19, 24, 514 N.E. 2d 394, 400.

Although appellant herein does not focus on the prosecutor's remarks regarding appellant's failure to make a

sworn statement,[4] we deem it appropriate at this juncture to examine the general propriety of such remarks. R.C. 2929.03(D)(1) provides in pertinent part that "[i]f the offender chooses to make a statement, he is subject to cross-examination only if he consents to make the statement under oath or affirmation." This section grants the defendant in a capital proceeding the right to make an unsworn statement at the penalty stage. To permit the prosecutor to extensively comment on the fact that the defendant's statement is unsworn affects Fifth Amendment rights and negates the defendant's statutory prerogative. However, to totally restrict the prosecutor from making *any* comment would likewise be unfair, especially where the defendant, in his unsworn statement, has offered something less than "the truth, the whole truth and nothing but the truth." Therefore, notwithstanding our previous pronouncements in *State v. Mapes* (1985), 19 Ohio St. 3d 108, 116, 19 OBR 318, 324-325, 484 N.E. 2d 140, 147, we now hold that where the defendant chooses to make an unsworn statement in the penalty stage of a capital trial, the prosecution may comment that the defendant's statement has not been made under oath or affirmation, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses. While the remarks made herein surely exceed the proper scope of comment set forth today, we find that such remarks are harmless error in light of the overwhelming weight of the aggravating circumstances in this case relative to the factors offered in mitigation, as discussed *infra.*

The foregoing analysis, however, leaves unanswered the question of what may be presented by the prosecutor to rebut the untruthful comments of a defendant in his unsworn statement or, for that matter, testimony of defense mitigation witnesses which is untruthful.[5] For an answer to this problem, which has perplexed various courts, including this court, in past cases, we again turn to R.C. 2929.03(D)(1). That statute provides in pertinent part that "[t]he prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death." We believe that the prosecutor, in order to effectively discharge this burden, must be empowered to rebut mitigation evidence offered by the defendant where the prosecutor has a good faith basis for believing that such evidence is false.

We find further support for this

---

[4] The pertinent remarks, which occurred during the prosecutor's closing argument during the penalty stage, were as follows:

"[T]he gentleman for the defendant, he told you five different times about the oath you took, and about the oath we all take, and the oath I take, and the oath you take—everybody takes the oath except the defendant; he isn't man enough to get up here and take the oath. Everybody in this case took the oath. Everybody in this case raised his right hand to this man, and he says I solemnly swear to tell the truth, the whole truth and nothing but the truth so help me God. Everybody except DePew. * * *"

[5] By this discussion, we do not intend to suggest any belief that appellant herein or any of the defense witnesses presented untruthful statements during this proceeding.

conclusion in R.C. 2929.03(D)(2), which provides in pertinent part that "[u]pon consideration of the relevant evidence raised at trial, the testimony, *other evidence,* statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. * * *" (Emphasis added.) We believe that this allowance of "other evidence" permits the prosecutor to rebut, where appropriate, the unsworn statement of the defendant and the testimony of other witnesses. The prosecutor may accomplish this by presenting "other evidence," including testimony of witnesses to contravene the mitigating evidence offered by the defendant.

For example, if the defendant asserts in his unsworn statement, or one of his witnesses testifies, that defendant attends the 9:00 Mass in his local parish every Sunday morning, and if such an assertion is untrue, it would be proper for the prosecutor to call the local parish priest as a rebuttal witness to testify that, to his regret, he had never seen the defendant in church at all.

Considering all the foregoing, one major issue still remains: What are the prosecutor's options, and what is the trial court's responsibility, if the defendant, in his unsworn statement, or one of his witnesses declares that defendant has never been in trouble with the law before this offense, when in fact the defendant has a prior criminal record? May the prosecutor offer, and should the trial court permit and ac- cept, evidence of the defendant's prior criminal record so that the jury will have all the facts before it? Has the defendant, by his untruthful or incomplete unsworn statements, placed in issue the mitigating factor described in R.C. 2929.04(B)(5),[6] so as to permit the state to introduce evidence of the defendant's prior criminal record, if any?

We recognize that the purpose of an unsworn statement is to avoid cross-examination, particularly about one's prior criminal record. Similarly, the defendant in a capital case has the option of requesting a pre-sentence investigation, which may not be undertaken without such a request. R.C. 2929.03(D)(1). We believe this option was also designed to afford the defendant the right to prevent his previous criminal record from being revealed to the sentencing body. It would seem that to permit witnesses for the prosecution to testify as to a defendant's previous criminal history would frustrate the very purpose for which an unsworn statement and a discretionary pre-sentence investigation are statutorily permitted.

However, to permit the defendant to make a false or incomplete unsworn statement regarding his criminal history would present the jury with something less than a full picture. As we have interpreted R.C. 2929.03 today, the prosecutor is accorded great latitude in presenting the state's case in the penalty stage as well as the guilt stage. Therefore, if the defendant falsely claims in his unsworn statement that he has little or no prior criminal history, the prosecutor should be permitted to demonstrate the inaccuracy of this assertion by appropriate evidence, defendant having raised the R.C. 2929.04(B)(5) factor. Similarly, if

---

[6] R.C. 2929.04(B)(5) permits the defendant to offer evidence concerning his "* * * lack of a significant history of prior criminal convictions and delinquency adjudications."

the defendant remains silent on this issue, but a mitigation witness called by the defense falsely or incompletely testifies on the extent of the defendant's criminal record, the prosecutor should be permitted to rebut. We hold, therefore, that the prosecutor, in the penalty stage of a capital trial, may rebut false or incomplete statements regarding the defendant's criminal record. This right is limited, however, to those instances where the defense offers a specific assertion, by a mitigation witness or by the defendant, that misrepresents the defendant's prior criminal history.

Appellant next contends that the trial court erred in admitting into evidence, during the penalty stage, a photograph of appellant standing next to a marijuana plant. Appellant argues that the photo, which was referred to by the prosecutor in his final remarks in the penalty stage, was offered for the sole purpose of prodding the jury to impose a harsh penalty.

Admission of the marijuana photograph was error, since its probative value was nonexistent and its potential for prejudice was significant. However, given the overwhelming evidence supporting the existence of the nine aggravating circumstances admitted by appellant, balanced against the relatively unremarkable evidence offered in mitigation (discussed *infra*), it is beyond a reasonable doubt that the jury would have sentenced appellant to death without having seen this photograph. The factors supporting death as a penalty were so persuasive and so numerous that this single photograph cannot be regarded as having materially prejudiced appellant. Thus, the error was harmless beyond a reasonable doubt. Cf. *Thompson, supra,* at 9, 514 N.E. 2d at 416.

Appellant next contends that the prosecution engaged in misconduct by reminding the jury that any sentence less than death could result in eventual parole, by alluding to facts not in evidence, by asking the jury why appellant did not call certain persons to the stand, and by appealing to the jury's desire for law and order. In determining whether these remarks constituted reversible error, it is not enough to find that the comments were inappropriate or even universally condemned. *Darden* v. *Wainwright, supra,* at 181. The relevant question is whether they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly* v. *DeChristoforo* (1974), 416 U.S. 637, 643.

In *Darden, supra,* the United States Supreme Court upheld the conviction and death sentence of a defendant who claimed he had been deprived of a fair trial by prosecutorial misconduct. The prosecutor, in his closing argument in the guilt phase, had referred to the accused as an "animal"; repeatedly expressed his regret that the defendant had not been "blown away" by his victim; and stated his belief that the death sentence was the only way to ensure that the defendant would never be on the streets again. Conceding that these remarks were "undoubtedly improper," *id.* at 180, the court nevertheless held that the comments did not deprive the accused of a fair trial. In so holding, the court found that the prosecution had not manipulated or misstated the evidence, nor had the remarks implicated other rights of the defendant, such as the right to counsel or the right to remain silent. *Id.* at 182. The court further noted that the evidence against the accused was overwhelming, which "reduced the likelihood that the jury's decision was influenced by argument." *Id.*

The remarks by the prosecutor in

288

*Darden* were clearly more inflammatory than those complained of herein. The comments in the instant cause did not contaminate the proceedings to the point that appellant's right to a fair trial was destroyed. The evidence supporting the sentence of death in this case was indeed overwhelming. The remarks in question did not render the penalty stage of appellant's trial fundamentally unfair.

While the prosecutorial misconduct in this case does not require a reversal of appellant's sentence, we express our mounting alarm over the increasing incidence of misconduct by both prosecutors and defense counsel in capital cases. We have previously voiced our disapproval of the various forms of misconduct by counsel in such cases. See, *e.g., Thompson, supra,* at 14-15, 514 N.E. 2d at 420-421; *Apanovitch, supra,* at 24, 514 N.E. 2d at 400. Apparently, our efforts in this regard have been something less than successful, and the avenues for prevention and correction by trial courts, appellate courts and this court are relatively few. Time and again we see counsel misconduct which in many cases would appear to be grounds for reversal and the vacating of convictions and/or sentences. In cases where the evidence of guilt is overwhelming and the statutory criteria have been met for both conviction and sentence of death, we have not chosen this alternative except in rare instances. As indicated, we have previously spoken on this subject and the case before us presents a good example.

As outlined above, the prosecutor in this case openly declared at a pretrial hearing that he did not care whether appellant received fair treatment. Later the prosecutor informed the jury of an alleged knife fight, which was not in evidence, and implied thereby that appellant was guilty of wrong-

doing, of which there was absolutely no evidence. Further, the prosecutor commented to the jury on a subsequent conviction of appellant, unsupported by any evidence in the record, and then told the jury that no such conviction existed. The prosecutor then further exhibited and commented on a totally irrelevant photograph depicting appellant next to a marijuana plant. Further, the prosecutor, in his closing remarks at the penalty stage, told the jury that "[i]t's not necessarily true that if you get three counts of twenty to life that it will add up to sixty—that's not necessarily true." While this does not involve a *total* misstatement of the law (see R.C. 2967.13 [D] and [E]), it certainly could be construed as misleading.

While all these comments, taken together or even standing alone, constitute unreasonable and unfair conduct by the prosecutor, we must balance against that conduct the admission of appellant that he brutally stabbed to death a young mother, her daughter and her younger sister and then mutilated their bodies by fire. In cases such as this, we cannot ignore the compelling interest of the public, which has every right to expect its criminal justice system to work effectively. Nor can we disregard the defendant's right to a fair trial, which is mandated by the Sixth Amendment to the United States Constitution.

There is one other alternative left to the courts in expressing our condemnation of intentional or unjustifiable misconduct by either prosecutors or defense counsel. Attorneys, trial courts, courts of appeals and this court should remain ever vigilant regarding the duties of counsel as exemplified in the following standards.

DR 1-102(A)(5) of the Ohio Code of Professional Responsibility provides that a lawyer shall not "[e]ngage in

conduct that is prejudicial to the administration of justice."

DR 7-102(A)(5) states that a lawyer shall not "[k]nowingly make a false statement of law or fact." DR 7-106 provides that an attorney shall not "[s]tate or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence."

The proposed standards of the American Bar Association for prosecutors provide in relevant part that "[i]t is unprofessional conduct to ask a question which implies the existence of a factual predicate which the examiner cannot support by evidence." ABA Standards Relating to the Prosecution Function and the Defense Function, The Prosecution Function (Tent. Draft 1970) 123, Section 5.7(d). These standards further provide that "[t]he prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." *Id.* at 126, Section 5.8(c).

In order to preserve the fairness of trial proceedings and to deter further misconduct, it is henceforth the intention of this court to refer matters of misconduct to the Disciplinary Counsel in those cases where we find it necessary and proper to do so. We encourage all trial courts and appellate courts to take similar steps where appropriate.

Appellant's Proposition of Law XII contends that reversible error was committed in the penalty phase when the prosecutor argued, and the trial court instructed the jury on, mitigating factors not claimed by appellant. He submits that these statements impermissibly focused the jury's attention on the number of available mitigating factors absent from appellant's case.

R.C. 2929.04(B) and (C) deal with mitigation and were designed to enable *the defendant* to raise issues in mitiga-

tion and to facilitate his presentation thereof. If the defendant chooses to refrain from raising some of or all of the factors available to him, those factors not raised may not be referred to or commented upon by the trial court or the prosecution. When the *purpose* of these sections is understood, it is clear that such comment is appropriate only with regard to those factors actually offered in mitigation by the defendant. This is especially apparent when the purpose is considered in conjunction with the mandate found in R.C. 2929.04(B) that "* * * the court, trial jury, or panel of three judges shall consider, and weigh *against* the aggravating circumstances * * *" (emphasis added) the listed factors that are presented by way of mitigation. If evidence on any of the factors is not offered by the defendant or if any of the factors would not, in fact, be useful in mitigation, then it would be impossible to weigh those factors *against* the aggravating circumstances.

Further support for this conclusion may be found by reading R.C. 2929.04 (C) in conjunction with R.C. 2929.04 (B). Subsection (C) provides that "[t]he *defendant* shall be given great latitude in the presentation of evidence of the factors listed in division (B) of this section * * *." (Emphasis added.) Thus, it is the defendant who has the right to present and argue the mitigating factors. If he does not do so, no comment on any factors not raised by him is permissible. Likewise, where the defendant does not raise a particular mitigating factor, that factor need not be considered in the opinions of the trial court and the appellate court or in the process of weighing mitigating factors against the aggravating circumstances.

In this case, the trial court read all the statutory mitigating factors to the jury but made no comment on the fac-

tors that were not presented by appellant. This was certainly not prejudicial error, though the better practice is certainly to refrain from even referring to mitigating factors not raised by the defendant.

Moreover, this court has repeatedly held that the sentencing body must consider the statutory mitigating factors raised by the defendant, but need not find that any particular factor exists or that the factors presented by appellant are in fact mitigating. See, *e.g., Steffen, supra,* at 116-117, 31 OBR at 278, 509 N.E. 2d at 390; *State* v. *Byrd* (1987), 32 Ohio St. 3d 79, 81, 512 N.E. 2d 611, 615; *State* v. *Stumpf* (1987), 32 Ohio St. 3d 95, 100-101, 512 N.E. 2d 598, 604-605.

In his Proposition of Law XIII, appellant contends that the trial court erred in instructing the jury to disregard considerations of sympathy in its deliberations. This precise argument has been repeatedly rejected by this court. See, *e.g., Jenkins, supra,* at paragraph three of the syllabus; *Steffen, supra,* at 125, 31 OBR at 285, 509 N.E. 2d at 396; *Byrd, supra,* at 86, 512 N.E. 2d at 619. Appellant advances no compelling reasons to alter this court's position.

In his Proposition of Law XIV, appellant first argues that the trial court erred in refusing to consider as mitigating certain evidence offered by appellant in the penalty phase. The evidence which appellant contends that the trial court erroneously rejected was the testimony of appellant's family and friends concerning the good relationship he had with his family, his kind, generous and helpful nature, his work record, and his remorse as expressed in his unsworn statement.

In the separate opinion required by R.C. 2929.03(F), the trial court outlined in considerable detail the evidence offered by appellant in mitigation. In arguing that the trial judge erroneously discounted appellant's mitigating evidence, appellant extracts the following portion from the trial court's opinion:

"The mitigating factors offered to counterbalance the aggravating factors were hardly mitigating factors at all, they were simply sympathy generating factors. Except for the fact that this defendant has a history of no arrests or convictions and has been a non-violent individual, the so-called mitigating factors basically call for emotional considerations of sympathy and mercy."

This court has recently held that:

"While R.C. 2929.04(B)(7) evinces the legislature's intent that a defendant in a capital case be given wide latitude to introduce any evidence the defendant considers to be mitigating, this does not mean that the court is necessarily required to accept as mitigating everything offered by the defendant and admitted. The fact that an item of evidence is admissible under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight." *Steffen, supra,* at paragraph two of the syllabus.

While the trial court is required to *consider* any evidence presented by the defendant pursuant to R.C. 2929.04 (B), it is not required to find that such evidence actually constitutes a mitigating factor. *Stumpf, supra,* at 101, 512 N.E. 2d at 605. "Under R.C. 2929.04(B), evidence of an offender's history, background and character which the jury, trial court, or panel of three judges considered, but did not find to be mitigating, need be given little or no weight against the aggravating circumstances." *Id.* at paragraph two of the syllabus.

Obviously, the trial court in the instant case considered the evidence presented by appellant, but gave it little

weight in comparison to the aggravating circumstances. In accordance with *Steffen* and *Stumpf, supra,* this was not error.

In his Proposition of Law XV, appellant argues that the process for proportionality review in Ohio fails to meet constitutional standards to the extent that the process does not require appellate courts to review and compare cases in which the death penalty was sought but not imposed.

This precise argument was rejected by this court in *Steffen, supra.* "The proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." *Id.* at paragraph one of the syllabus. The *Steffen* court specifically found that this standard of proportionality review comports with constitutional requirements. *Id.* at 123, 31 OBR at 283, 509 N.E. 2d at 394.

Appellant's Proposition of Law XVI attacks the constitutionality of the statutory scheme for imposition of the death penalty in Ohio. Appellant concedes that the arguments raised in this proposition echo those addressed and rejected by this court in *Jenkins* and *Maurer, supra.* No compelling reasoning is advanced which would affect this court's previous position.

The final tasks to be completed in this court's review of the instant case are the proportionality review and the independent weighing process, both required by R.C. 2929.05(A).

Appellant presents no argument alleging that the death sentence in his case was disproportionate. Compared with the previous death penalty cases decided by this court, the sentence herein is not excessive or disproportionate. Appellant murdered three persons in the course of an aggravated burglary, and then committed aggravated arson. In *State* v. *Brooks* (1986), 25 Ohio St. 3d 144, 25 OBR 190, 495 N.E. 2d 407, the defendant, also convicted of three murders, received the death penalty without the additional aggravating circumstances such as those present here. Many cases wherein the death penalty was imposed and upheld involved only a single victim. See, *e.g., Apanovitch, supra; Mapes, supra.* Clearly, the death sentence imposed on appellant is not disproportionate when compared to the cases previously decided by this court.

Finally, this court is required to independently weigh the evidence and consider the offense and the offender to determine if the aggravating circumstances of which appellant was found guilty outweigh the mitigating factors in this case. R.C. 2929.05(A).

In the penalty phase of the trial, appellant presented twenty witnesses. These witnesses, consisting of appellant's friends and family members, testified that appellant was a helpful, gentle, easy-going person, friendly, well-behaved, and good with children. They stated that he took good care of his father, who suffered a lengthy illness before his death in 1980. Several witnesses testified that appellant's father was extremely strict, occasionally resorting to physical punishment.

In his own unsworn statement to the jury, appellant expressed regret for what he had done and apologized to the family of his victims. He declared that he had never intended to kill anyone, and that he could not explain what had caused him to commit such acts. Appellant stated that he had never been arrested before the night of the murders. He stressed that he had always tried to be a good person, pointing out that he had spared the life of the infant present in the house by

carrying her outside and placing her on a neighbor's porch.

It can be seen from the foregoing that of the specific mitigating factors listed in R.C. 2929.04(B)(1) through (6),[7] appellant raised only one: his lack of a criminal record prior to the offense. The remaining evidence concerned the "history, character, and background of the offender * * *," which are relevant considerations under R.C. 2929.04(B).

Against these considerations this court must weigh all the aggravating circumstances proved beyond a reasonable doubt. We conclude that the mitigating factors in this case pale when compared to the aggravating circumstances, which consist of the horribly brutal murders of a woman and two children and the subsequent destruction of their home and mutilation of their bodies by fire. The nine aggravating circumstances in this case[8] easily outweigh the mitigating factors set forth by appellant.

Of the eleven friends who testified as to appellant's good character, eight had not had much contact with appellant for several years before the murders, which weakens the import of their testimony. With the exception of his somewhat troubled relationship with his father, appellant's family history reflects an apparently normal home environment. Among the volume of testimony offered by appellant, very little can be found which "lessens the moral culpability of the offender or diminishes the appropriateness of death as the penalty * * *." *Steffen, supra,* at 129, 31 OBR at 289, 509 N.E. 2d at 399.

As to the nature or circumstances of the offense, appellant appears to argue that his treatment of the infant on the night of the murders is mitigating. It is difficult to agree. That appellant committed only three murders when he had the opportunity to commit a fourth can hardly be characterized as an extenuating circumstance.

In short, we find, beyond a reasonable doubt, that the unusual number of aggravating circumstances in this case is not outweighed by the relatively meager mitigating factors offered by appellant. Thus, the sentence of death imposed upon appellant must stand.

Therefore, in accordance with the

---

[7] The enumerated mitigating factors set forth in R.C. 2929.04(B)(1) through (6) are:

"(1) Whether the victim of the offense induced or facilitated it;

"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

"(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

"(4) The youth of the offender;

"(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim[.]"

[8] The nine aggravating circumstances of which appellant was found guilty consist of three specifications for each count of aggravated murder. These specifications are as follows: the commission of aggravated murder while committing or attempting to commit the offense of aggravated burglary, the commission of aggravated murder while committing the offense of aggravated arson, and the commission of aggravated murder which was part of a course of conduct involving the purposeful killing of two or more persons.

foregoing, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY and LOCHER, JJ., concur.

HOLMES, J., concurs in the syllabus and judgment only.

WRIGHT and H. BROWN, JJ., concur in part and dissent in part.

WRIGHT, J., concurring in part and dissenting in part. While I would affirm appellant's conviction, I would reverse his sentence of death and remand for resentencing.

I

At the outset, I would stress my respect for my colleagues in the majority because I believe that they share my regard for fundamental fairness and due process. As a court of last resort, it is imperative that we be sensitive to these considerations. However, I must part company with my brethren because the record before us contains examples of prosecutorial misconduct of the worst sort.

Although the majority opinion concedes that the prosecution indulged in misconduct during the penalty stage of the trial, it asserts — in what has become a frequent refrain in far too many criminal cases before us — that the errors were "harmless." Once again, the majority denounces the prosecutorial misconduct obvious in this case, but allows it to continue unheeded, permitting the state to further chip away at the right to fundamental due process and a fair trial pursuant to the Fifth and Fourteenth Amendments to the United States Constitution. As Judge Jerome Frank aptly stated in his classic dissent in *United States* v. *An-*

*tonelli Fireworks Co.* (C.A. 2, 1946), 155 F. 2d 631, 661:

"This court has several times used vigorous language in denouncing government counsel for such conduct * * *. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable. It means actual condonation of counsel's alleged offenses, coupled with verbal disapprobation. If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. For otherwise it will be as if we declared in effect, 'Government attorneys, without fear of reversal, may say just about what they please in addressing juries, for our rules on the subject are pretend-rules. If prosecutors win verdicts as a result of "disapproved" remarks, we will not deprive them of their victories; we will merely go through the form of expressing displeasure. The deprecatory words we use in our opinions on such occasions are purely ceremonial.' Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court — recalling the bitter tear shed by the Walrus as he ate the oysters — breeds a deplorably cynical attitude towards the judiciary."

In addition, the majority asserts that the prejudicial effect of many of the prosecutor's remarks was "greatly minimized" by curative instructions by the judge, and in a few cases, apologies by the prosecutor and requests to the jury that they disregard his remarks. It is pure sophistry to argue that limiting instructions or prosecutorial apologies obviate the serious damage that results from improper comments. The giving of these limiting instructions is akin to trying to efface indelible ink with an eraser. The

more you try to erase the mistake, the more you call attention to it — until finally you are tearing the very fiber of due process protections.

Judge Learned Hand once wrote that the curative instruction is a "device which satisfies form while it violates substance; that is, the recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else." *Nash* v. *United States* (C.A. 2, 1932), 54 F. 2d 1006, 1007. Judge Frank stated that such an instruction "is a kind of 'judicial lie': It undermines a moral relationship between the courts, the jurors, and the public; like any other judicial deception, it damages the decent administration of justice." *United States* v. *Grunewald* (C.A. 2, 1956), 233 F. 2d 556, 574 (dissenting opinion). And Justice Felix Frankfurter once asserted that the prosecution "should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds." *Delli Paoli* v. *United States* (1957), 352 U.S. 232, 248 (dissenting opinion).

For these reasons, curative instructions are disfavored by courts. But this disfavor rises to a level of condemnation when the error is so egregious that the instructions or comments designed to remove the prejudicial effect are rendered nugatory.[9]

## II

The majority places heavy reliance on these two arguments — "harmless error" and the effective use of curative instructions — in finding that prosecutorial misconduct in this case was non-prejudicial. As discussed *infra,* I believe the untoward conduct of the prosecution improperly inflamed the passion of the jury and any assertion that such passion was quelled by curative instructions or that the effect on the jury was harmless is without merit.

## A

At an evidentiary hearing prior to trial, the state certainly set the tone of the proceedings with the following colloquy between the trial judge and the prosecutor:

"BY THE COURT: Would that be fair to the defendant in this case?

"MR. SAGE: Well I don't care what's fair to the defendant, Your Honor."

In an effort to insure that an accused receives a fair trial, the Code of Professional Responsibility requires the following of the prosecutor:

---

[9] A recent study by the American Bar Foundation and Northwestern University indicates that juries are not likely to heed a judge's instruction or admonition to ignore certain evidence they have heard. Allen, When Jurors Are Ordered to Ignore Testimony, They Ignore the Order (Jan. 26, 1988), Wall St. J., at 31, col. 3.

"The American Bar Foundation experiment is one of the latest in a growing body of research by social scientists suggesting the limits of judicial admonishments. In the experiment, 536 subjects were shown a videotape of closing arguments in a mock trial of police officers accused of improperly searching the house of a suspected criminal

* * *. About a third of the viewers were told the search turned up incriminating evidence, which the judge instructed them to ignore since it wasn't relevant to determining the reasonableness of the police conduct.

"But researchers found that, far from disregarding the results of the search, jurors tended to use them to make sense of preceding events, a phenomenon psychologists call 'hindsight bias.' When evidence of criminality was found, for example, jurors remembered evidence that supported the officers' story. They even remembered the policeman to be experienced—a fact not mentioned in the trial. * * *" *Id.* at col. 2-3.

"The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict. This special duty exists because: (1) the prosecutor represents the sovereign and therefore should use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute; (2) during trial the prosecutor is not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all; and (3) in our system of criminal justice the accused is to be given the benefit of all reasonable doubts * * *." EC 7-13 of the Code of Professional Responsibility.

Standing alone, this flippant remark by the prosecutor was harmless, but what followed certainly was not. As will be shown, the cumulative effect of this misconduct was to deny appellant a fair trial in connection with mitigation.

### 1

Appellant produced substantial evidence that prior to the terrible offenses for which he was tried, he had not violated the law and had lived a productive life. In an effort to convince the jury that the offenses involved were the product of a one-time instance of aberrational misconduct, twenty witnesses testified concerning appellant's character, personality, and lifestyle.

Among others, Mike Dingledine testified that the appellant was a quiet and easy-going person. On cross-examination, the prosecutor attempted to rebut this testimony by introducing the fact that appellant had previously been involved in a knife fight at a convenience store. Defense counsel objected to the question and moved for a mistrial, alleging that no facts were elicited on direct examination which demonstrated that a knife fight had taken place. Instead, defense counsel explained that appellant walked out of the store and someone stabbed him. No fight actually occurred and the prosecutor reluctantly conceded that he had no evidence to the contrary.

The trial court agreed with defense counsel that a fight had not taken place, stating, "I mean, the fact is, if it wasn't a fight, if he just got stuck with a knife — that's not a fight." The court sustained the objection, did not grant the mistrial, and gave a curative instruction to the jury to disregard the information concerning the so-called "knife fight."

The tactic used by the prosecutor was clearly improper. "The attempt to communicate by innuendo through the questioning of witnesses when the questioner has no evidence to support the innuendo is improper." *State* v. *Williams* (1977), 51 Ohio St. 2d 112, 119, 5 O.O. 3d 98, 102, 364 N.E. 2d 1364, 1368, vacated as to the death penalty (1978), 438 U.S. 911.

The prosecutor also violated standards set forth by the American Bar Association, which provide that it "is unprofessional conduct to ask a question which implies the existence of a factual predicate which the examiner cannot support by evidence." ABA Standards Relating to the Prosecution Function and the Defense Function, The Prosecution Function (1970) 39, Section 5.7(d).

While admitting that the prosecutor's action in this regard was improper, the majority states that "it was not so egregious as to require reversal." In other words, the error was harmless.

### 2

In the present case, appellant was on trial for the crimes of aggravated murder, which occurred on November 23, 1984. After that date, appellant was arrested and convicted for the unrelated crime of receiving stolen property.

No reference was made to the later conviction during the guilt phase; however, the subject was raised at the mitigation hearing. Appellant made an unsworn statement to the jury in which he stated he had "never been arrested or convicted of anything before the night this happened." During the mitigation hearing, the prosecutor told the jury that appellant "wouldn't sit in that [witness] chair because then he would have to answer my questions. And then I would ask him if he's ever been convicted of a criminal offense after the date in question in this case." Defense counsel immediately objected and sought a mistrial, which the trial court denied. Instead, the court gave a "curative" instruction and the prosecutor apologized for a highly improper comment.

In further discussing appellant's unsworn statement, the prosecutor stated:

"The other thing I thought in this case, you know, nothing in this case can be fun, and I don't mean for it to be that way. But the gentleman for the defendant, he told you five different times about the oath you took, and about the oath we all take, and the oath I take, and the oath you take — everybody takes the oath except the defendant; he isn't man enough to get up here and take the oath. Everybody in this case raised his right hand to this man, and he says I solemnly swear to tell the truth, the whole truth and nothing but the truth so help me God. Everybody except DePew."

The majority agrees that the pros-ecutor exceeded permissible comment on the unsworn statement. The comment did not go to the fact that the defendant's statement had less credibility because it was not under oath; instead, it encompassed another crime committed by appellant. As a result, the comment was clearly prejudicial under any rationale.

In *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 15 OBR 311, 473 N.E. 2d 264, this court had an opportunity to examine prosecutorial comments on the unsworn nature of a defendant's statement. One of four key factors the *Jenkins* court listed was "the prosecutor's comments were limited to the fact that unlike other witnesses, the statement of appellant was not made under oath." *Id.* at 217, 15 OBR at 357, 473 N.E. 2d at 310. As a result, in *State* v. *Mapes* (1985), 19 Ohio St. 3d 108, 19 OBR 318, 484 N.E. 2d 140, and *Jenkins,* this court focused on the importance of the *limited* scope of the prosecutor's comments as determining their propriety.

Since the prosecutor's comments exceeded the limits of commenting on the unsworn nature of the statement, appellant's mitigation hearing was infected with prejudicial information.

The majority holds that the prosecutor's statement that he wanted to ask appellant about a later criminal conviction was "not so prejudicial as to require reversal." Concerning the discussion of the unsworn statement, the majority states: "While the remarks made herein surely exceed the proper scope of comment set forth. today, we find that such remarks are harmless error in light of the overwhelming weight of the aggravating circumstances in this case relative to the factors offered in mitigation." I disagree.

### 3

At the mitigation hearing, a photo-

graph was offered and admitted into evidence that depicted appellant standing next to a marijuana plant. The prosecutor referred to this photograph in his closing argument:

"[S]o we thought we would show you a few things we thought were relevant — we thought were relevant, you know, to the last five years. There it says self and little brother, first year, (unclear) homegrown ten feet tall. Growing a little grass there you see."

The majority concedes that this photograph had no other purpose than to incite prejudice against appellant. The introduction of and the reference to the photograph were irrelevant for purposes of the sentencing phase of appellant's trial. Nevertheless, the majority again held that admission of "this single photograph" — without reference to the concomitant prosecutorial comments — was harmless error.

### 4

Finally, the prosecutor made several comments during the closing argument in the mitigation phase of the trial that were so egregious that they clearly denied appellant's right to a fundamentally fair sentencing hearing as guaranteed by the Constitution.

The prosecutor made the following improper comments about the possible sentences that appellant could receive:

"The defense says, and I knew they would, it doesn't make any difference what kind of penalty that you put on him because any sentence you give him is the death sentence. But that's not true. That's not true. Why, my goodness, Sirhan Sirhan is talking about getting out for killing Bobby Kennedy."

After defense counsel objected, the prosecutor continued as follows:

"Well, if Your Honor please, he led them to believe that life means life, and it doesn't necessarily mean that, as the court knows.

"* * *

"Now, you're going to have a lot of * * * three options in this case, and you know what the three of them are. But what I'm telling you, when you hear, as the defendant told you, that twenty to life * * * or life with eligibility in twenty means you're going to be there for life — that's not necessarily true.

"It's not necessarily true that if you get three counts of twenty to life that it will add up to sixty — that's not necessarily true. And that's the way the law is."

The prosecutor misstated the law and was speculating as to the possibility that appellant could receive parole, which could shorten his sentence. The possibility of parole is outside the province of the jury and impossible under the present law. *California* v. *Ramos* (1983), 463 U.S. 992, 1026, fn. 13; *Farris* v. *State* (Tenn. 1976), 535 S.W. 2d 608, 609. As the Tennessee Supreme Court noted in *Farris* v. *State, supra,* at 614, jurors should not be informed about the possibility of parole because "jurors tend to attempt to compensate for future clemency by imposing harsher sentences." Similarly, in the present case appellant was prejudiced beyond doubt because the jurors may have imposed a harsher sentence because of the prosecutor's comments.

In addition, Prosecutor Holcomb alluded to several facts in the closing argument that were not in evidence. The prosecutor told the jury that appellant's confession was not voluntary in that appellant made the confession only after he knew his girlfriend had turned him in, which was four months after the crime. Nothing in the trial record supports the foregoing statement. Although defense counsel did not object, a prosecutorial argument reciting facts not in evidence is plain

error "[w]here an error seriously affects the basic fairness of the judicial process." *State* v. *Goodin* (Nov. 23, 1977), Hamilton App. No. C-76510, unreported, at 35.

The prosecutor also asked the jurors why appellant did not present certain witnesses in the mitigation phase. In particular, the prosecutor asked the jurors why Debbie Sowers did not testify. He suggested that Sowers did not testify because she would then be subjected to cross-examination. The innuendo is that appellant was hiding something. Once again, the prosecutor was referring to facts outside the record and improperly bringing to the jurors' attention witnesses who did not testify on behalf of the appellant.

Relying on *Darden* v. *Wainwright* (1986), 477 U.S. 168, 181, the majority conceded that these remarks were improper but held that they "did not render the penalty stage of appellant's trial fundamentally unfair." In other words, the majority again found "harmless error."

The majority's reliance on *Darden,* however, is misplaced for several reasons. First, the prosecutorial remarks challenged in *Darden* occurred during the guilt-innocence stage of the trial and not the penalty stage, as is the case here. Second, the *Darden* case involved altogether different prosecutorial comments than those expounded by the prosecutor in the instant case[10] and much of the objectionable content in *Darden* was invited by or was responsive to remarks by defense counsel. Finally, the *Darden* case stated — and

today's majority attempts to echo — that the prosecutor's arguments "did not manipulate or misstate the evidence." *Id.* at 182. While that may have been true in *Darden,* it certainly, is not the case here. The prosecutor's statement to the jury that "[i]t's not necessarily true that if you get three counts of twenty to life that it will add up to sixty — that's not necessarily true" is a clear-cut misstatement of law. The majority's suggestion that this comment "does not involve a *total* misstatement of the law" is inherently illogical. In addition, it is obvious that many of the prosecutor's improper comments concerning facts not in evidence, some of which he apologized to the jury for making, obviously involve a manipulation of the evidence, which is clearly proscribed by *Darden.*

### B

In addressing the various acts of prosecutorial misconduct, the majority treats the improper remarks and comments by the prosecutor divisibly — as individual errors. But prosecutorial misconduct is indivisible. The improper remarks made by the prosecutor in this case were not made in a vacuum; they were made to an impressionable jury.

Individually, which was the way the aforementioned errors were treated by the majority, some of the prosecutorial misconduct may indeed have proved harmless. But the cumulative effect of these transgressions, which was the true effect felt by the jury, denied appellant a fair trial. See *State* v. *Beuke* (1988), 38 Ohio St. 3d

---

[10] In *Darden,* the prosecutor attempted to place some of the blame for the crime on the Division of Corrections because the defendant was on a weekend furlough from a prison when the crime occurred. The prosecutor also implied the death penalty would be the only guarantee against a future similar act and characterized the defendant as an "animal" after defense counsel stated that the perpetrator of the crimes was an "animal." *Id.* at 179-180.

29, 46, 526 N.E. 2d 274, 291 (Wright, J., dissenting).

As the United States Court of Appeals for the Eleventh Circuit stated when it addressed the harmful effects of prosecutorial misconduct in a case such as this: "[I]t is most important that the sentencing phase of the [capital] trial not be influenced by passion, prejudice, or any other arbitrary factor. * * * With a man's life at stake, a prosecutor should not play on the passions of the jury." *Hance* v. *Zant* (C.A. 11, 1983), 696 F. 2d 940, 951, certiorari denied (1983), 463 U.S. 1210.

### C

Finally, I find the majority's "solution" to the problem of prejudicial prosecutorial misconduct particularly troublesome.

Unlike most of the countries throughout the world, our system is keyed to fair play and places the prosecution in the ofttimes difficult position of being a vigorous advocate for guilt and punishment while at the same time a defender of the accused's right to a fair trial.

Historically, the courts have ordered a new trial when the representative of the state strays from this role in a substantial fashion. The majority opinion concedes that repeated departures from the norm occurred by way of egregious misconduct by the state. A substantial amount of mitigating testimony was given in this case and the jury deliberated at great length.

I am troubled by the seeming departure from past case law that would compel reversal of the penalty phase of these proceedings and the suggestion that we should handle blatant prosecutorial misconduct through the Office of Disciplinary Counsel. I submit that this is cold comfort to the appellant who faces death by electrocution.

### III

As I previously mentioned, I by no means intend to suggest that my colleagues in the majority are insensitive to the due process rights of appellant. Such is most certainly not the case. However, by implication and direct comment, they clearly suggest that the public demands retribution by way of the death sentence where the facts reveal a brutal and senseless murder. I share this sense of outrage. Where we part company is the method used to achieve the ultimate goal in our Anglo-American system of criminal jurisprudence.

I cannot accept the notion that a popular result can always be equated with defending the rights of a criminal defendant. I am painfully aware that the "unpopular" position I take today will gain no plaudits but that is often the case when a court is dealing with the due process rights of an accused.

Therefore, for the foregoing reasons, I respectfully dissent from the result achieved by the majority.

H. BROWN, J., concurs in the foregoing dissenting opinion.