952 F.2d 403
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Sylvia HINKEL, Plaintiff-Appellant,
v.
NAVISTAR, INTERNATIONAL, CORP., et al. Defendant-Appellee.
 No. 90-3992.
 United States Court of Appeals, Sixth Circuit.
 Jan. 15, 1992.
 
 Before BOGGS, Circuit Judge; LIVELY, Senior Circuit Judge; and CLELAND, District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Sylvia Hinkel, widow of Raymond Hinkel, appeals various adverse determinations by the District Court in this ERISA action which alleges a wrongful denial of surviving spouse benefits. A bench trial was held in July, 1989, and judgment was entered for defendant. On appeal, plaintiff-appellant presents the following issues:
 
 
 2
 A. Whether the district court erred in determining:
 
 
 3
 1) that plaintiff-appellant failed to establish that she was married at common law and not entitled to Surviving Spouse benefits, and
 
 
 4
 2) that NAVISTAR's denial was neither arbitrary nor capricious.
 
 
 5
 B. Whether the district court erred in granting NAVISTAR'S motion in limine at trial precluding the introduction of damage evidence.
 
 
 6
 C. Whether the district court erred in not awarding to plaintiff-appellant penalties under 29 U.S.C. § 1132(c).
 
 
 7
 D. Whether the district court erred in not awarding to plaintiff-appellant attorney fees.
 
 
 8
 For the reasons that follow, we determine that the trial court did not err in any of the specifics alleged, and therefore affirm.
 
 I. BACKGROUND FACTS
 
 9
 Raymond A. Hinkel, deceased husband of plaintiff-appellant Sylvia Hinkel, was employed by defendant-appellee NAVISTAR in Canton, Ohio, beginning on or about December 4, 1950, continuing through his separation from NAVISTAR on or about October 22, 1982. During his period of employment, Raymond participated in an was a contributing member of the NAVISTAR Retirement Plan for Salaried Employees. Upon retirement, Raymond received monthly benefits from the NAVISTAR Retirement Plan until his death on or about September 7, 1984.
 
 
 10
 Sylvia and Raymond were married in a Roman Catholic ceremony on October 20, 1956, and produced two children from this marriage, John and Diane. Sylvia and Raymond were divorced on January 14, 1975, at which time Sylvia retained the family home on Ambler Avenue. The two lived apart, however, only until their reconciliation in October of 1978, when Raymond moved back into the family home on Ambler with Sylvia and daughter Diane.
 
 
 11
 On or about November 13, 1978, Sylvia and Raymond arranged for the construction of a new home on Redford Road. They signed loan papers at the Citizen Savings Bank on or about December 26, 1978, and after the house was completed in July, 1979, they moved in. Upon Raymond's death in September of 1984, Sylvia and Diane continued to live there until it was sold in August, 1986.
 
 
 12
 Sylvia argues from evidence which shows that after July 28, 1979, Sylvia and Raymond cohabited together, shared a joint checking and savings account, commingled paychecks, travelled in and out of the state as husband and wife, entertained as husband and wife, purchased family furnishings together, built a house together, attended functions as husband and wife, considered each other as husband and wife regardless of their divorce, and shared everyday responsibilities and joys of living as husband and wife.
 
 
 13
 On the other hand, NAVISTAR notes that between 1979 and 1984 Sylvia and Raymond stated on their respective income tax returns that they were single. Raymond's representations to his employer state that he was not married during this period, and Sylvia did the same on her employer's insurance application. Further, NAVISTAR points out, Raymond and Sylvia entered into a civil marriage ceremony on or about July 20, 1984, "to avoid trouble." Only a month and a half later, on September 7th, Raymond died.
 
 
 14
 By letter dated March 30, 1985, and again on May 29, 1985, Sylvia requested that NAVISTAR provide her information as to the amount of and the date of the start of survivor benefits due her under NAVISTAR's retirement plan. NAVISTAR did not provide Sylvia with the information requested by her on March 30, 1985 within 30 days of her request. In early June, 1985, Sylvia contacted Stephen E. Crowe, an employee of NAVISTAR, by telephone. At that time, Mr. Crowe verbally advised her that NAVISTAR had decided that she would not receive surviving spouse benefits as she was not "married" to Raymond for a period of one year at the date of his death. At that time, Sylvia inquired of Mr. Crowe concerning their common law marriage. Mr. Crowe stated that he would talk to a supervisor and would get back to her regarding the common law marriage.
 
 
 15
 Several days later, Sylvia received a letter from NAVISTAR dated June 5, 1985, regarding settlement of Raymond's participation in the contributory part of the Plan, but it made no mention of the survivor benefits allegedly due Sylvia.
 
 
 16
 By letter dated April 29, 1986, Sylvia's attorney requested that NAVISTAR contact counsel regarding her survivor benefits under the Plan. By letter dated September 29, 1986, NAVISTAR advised her that she was not entitled to benefits as she had not been "married" to Raymond for one year prior to his death. This letter was more than seventeen months after her initial inquiry. The September 29, 1986, letter from NAVISTAR contained neither a reference to nor a response to the common law marriage issue.
 
 
 17
 No longer able to afford the home she and her husband built in 1978, Sylvia sold the Redford Road home in August of 1986.
 
 
 18
 By letter dated May 28, 1987, Sylvia's attorney advised NAVISTAR that Appellant was proceeding with steps to be followed when a claim is denied as set out in the Handbook, "Benefits for You; Retirement Plan for Salaried Employees." In this way, Sylvia requested information of the Plan's claims review procedure as set out at page 23 of the Handbook. She further put NAVISTAR on notice of her application to appeal the denial of her surviving spouse claim under the Plan. NAVISTAR did not provide Sylvia with this requested information within 30 days of the May 28, 1987 letter, as required by ERISA. Sylvia finally received a copy of the Plan from NAVISTAR on or about December 31, 1987.
 
 II. ANALYSIS
 
 19
 A. THE "COMMON LAW MARRIAGE": WAS NAVISTAR'S DETERMINATION
 
 
 20
 ARBITRARY AND CAPRICIOUS?
 
 
 21
 At trial, plaintiff-appellee had the burden of establishing that the denial of her claim for spousal benefits was arbitrary and capricious, or in bad faith. Hall v. Mullins, 621 F.2d 253, 255 (6th Cir.1980). Here, NAVISTAR's denial of benefits was premised upon the July, 1984 marriage, and more specifically upon Raymond's election form submitted by him in August, 1984. On that form Raymond marked "July 20, 1984" as the date of his marriage to Sylvia, and named Sylvia as the designated beneficiary.
 
 
 22
 The retirement plan expressly and plainly prohibits the payment of a deceased retiree's survivor benefits to a spouse of less than one year. The remarriage did not last that long since Raymond died in September of that year. Therefore, the 1984 marriage does not entitle plaintiff to benefits.
 
 
 23
 At trial, however, Sylvia argued that she was entitled to benefits because of her asserted common law marriage to Raymond. She alleged that this began 1978, after their divorce and separation, when Raymond moved back home, followed by the construction of a new house where they remained until Raymond's death in 1984.
 
 
 24
 Nonetheless, it was the conclusion of the Magistrate and of the District Court that plaintiff did not show by clear and convincing evidence that a common law marriage existed. The standards of Ohio law in this regard are not contested by the parties. See e.g., State v. DePew, 38 Ohio St.3d 275, 528 N.E.2d 542 (1988). The preeminent element of proof lacking in Sylvia's presentation was the requirement of an agreement in praesenti to marry as of 1978. Cohabitation may be evidence of a "present" agreement, the court found, but the first marriage, the divorce and the remarriage are also factors within the evidence in contradiction of an agreement in praesenti to marry in 1978, and suggest wholly different intentions. In addition, the Magistrate pointed out the fact that Sylvia's own testimony reveals a lack of an agreement in praesenti. Appendix, V.I at 62, Magistrate's R & R at 9. Sylvia testified that she considered herself married to Raymond despite the divorce because of her religious convictions. If she truly believed in the continued status of the marriage, she would not logically be able to make an agreement in praesenti in 1978 to resurrect a relationship which remained vital.
 
 
 25
 Another element of proof found lacking by the court and magistrate was the requirement that the couple hold themselves out as married. Indeed, Sylvia presented ample evidence on this point which, if uncontradicted, would have been clear and convincing. However, there was also evidence presented by NAVISTAR, mostly documents, in which Sylvia or Raymond, or both, held themselves out as single. Mortgage papers, tax records, retirement papers, the deed to the new house and employment records all suggested that, although living together, Sylvia and Raymond were unmarried. This evidence clearly also belies any agreement in praesenti.
 
 
 26
 In light of all this, the trial court correctly concluded that plaintiff failed to establish by clear and convincing evidence that she entered a common law marriage in 1978.
 
 
 27
 Sylvia argues that the court should have found that NAVISTAR's refusal to accept a common law marriage as proof of marriage for purposes of the plan is arbitrary and unreasonable.[1] But she must first establish the common law marriage before she is entitled to make this argument, and having failed to do so, the issue is rendered moot.
 
 B. THE MOTION IN LIMINE
 
 28
 Sylvia also appeals a decision on a motion in limine filed by NAVISTAR. The motion sought to exclude evidence on punitive and compensatory damages with respect to the § 1132 count, because ERISA is exclusive and state law remedies are pre-empted. Therefore, punitive and extra-contractual damages are unavailable. Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 144 (1985); Varhola v. Doe, 820 F.2d 809, 817 (6th Cir.1987). The law supports the position taken by NAVISTAR and accepted by the trial court. There was no error.
 
 C. PENALTIES
 
 29
 Sylvia contends that NAVISTAR ignored her many requests for information about her rights under the plan after Raymond died. She argues that four letters sent by her and/or her attorney between March 30, 1985 and May 28, 1987 constituted four separate requests for information. At trial she sought an award of $100 per day in penalties for the refusal by defendant to provide the information sought pursuant to 29 U.S.C. § 1132(c).
 
 
 30
 Section 1132(c) provides that any plan administrator who fails or refuses to comply with a request from a beneficiary for any information within thirty days of receipt of that request may be held personally liable to such beneficiary in the amount of $100 per day from the date of such failure.
 
 
 31
 The court below found such a violation by NAVISTAR with respect to at least two of the letters. However, the court declined to impose any penalty since Sylvia did not suffer prejudice to her rights under ERISA. That is not a requirement for relief, but it is a consideration for the court. Porcellini v. Strassheim Printing Co., 578 F.Supp. 605 (E.D.Pa.1983). The assessment of any penalty is within the court's discretion per the language of the statute. Therefore the decision will stand, absent an abuse of discretion.
 
 
 32
 The focus of inquiry into an injury, if there be any, is upon the delay in receiving the information, not upon the denial of benefits. In this case, Sylvia was informed about two months after her first inquiry that she would not be receiving benefits. She had argued that she suffered financial loss in connection with the sale of her home, anticipating that she would be receiving the benefits.
 
 
 33
 The court's logic in denying penalties was to the effect that if she were never entitled to the benefits, she could not have suffered prejudice to any rights under ERISA. This is especially so if the failure to provide information did not result in the loss of the right to appeal, as is true in this case. Since Sylvia was made aware that the benefits were being denied fairly promptly, and because the right to appeal was preserved, the court found damages were not called for. There was no abuse of discretion here, and the district court's judgement is to be affirmed.
 
 D. ATTORNEY FEES
 
 34
 Finally, Sylvia argues here that the trial court erred in refusing to award attorney fees to her. The award of fees under § 1132(g) is discretionary with the court, and the decision will stand absent an abuse of discretion.
 
 
 35
 The court below is to examine the following guidelines:
 
 
 36
 1. The degree of the opposing party's culpability or bad faith;
 
 
 37
 2. The opposing party's ability to satisfy an award of attorney's fees;
 
 
 38
 3. The deterrent effect of an award on other persons in similar circumstances;
 
 
 39
 4. Whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA Plan or resolve significant legal questions regarding ERISA; and
 
 
 40
 5. The relative merits of the parties' positions.
 
 
 41
 Firestone Tire & Rubber Co. v. Neusser, 810 F.2d 550, 556 (6th Cir.1987).
 
 
 42
 Plaintiff did not prevail at trial. Under the analysis of this court, she does not prevail on appeal. There being no abuse of discretion, plaintiff's request for fees is properly denied.
 
 
 43
 Accordingly, each determination of the district court is hereby AFFIRMED.
 
 
 
 *
 Honorable Robert H. Cleland, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The plan would only take as proof of marriage a marriage certificate, license, or, if these were destroyed, possibly an eyewitness to the ceremony or a page from a bible. Appendix Vol. II at 212