JOURNAL ENTRY AND OPINION
Defendant-appellant, Wallace Nichols, appeals his convictions in the Cuyahoga County Common Pleas Court of rape and kidnapping. For the reasons that follow, we affirm appellant's conviction but vacate his sentence and remand the cause to the trial court for re-sentencing in accordance with our opinion.
On October 27, 1997, appellant was indicted in Case No. CR 356000 on one count of kidnapping, in violation of R.C. 2905.01, and one count of rape, in violation of R.C. 2907.02, regarding an alleged incident involving Gail Goldwin on August 8, 1997.
On November 10, 1997, appellant was indicted in Case No. CR 356936 on one count of kidnapping, in violation of R.C. 2905.01, and one count of rape, in violation of R.C. 2907.02, regarding an alleged incident involving Tracie Malone on August 15, 1997. The matters were joined for trial, which began on March 11, 1998.
Gail Goldwin testified for the state that she met and became friendly with appellant during the first week of August 1997 when he was painting her parent's home. Goldwin was eighteen years old and lived at home with her parents and siblings.
Goldwin testified that on August 8, 1997, appellant telephoned her at home after she got off work and asked her if she wanted to visit his cousin with him. Goldwin agreed and appellant picked her up at her house around 5:00 p.m. They drove to the home of appellant's nephew, Mark Hodge, on the west side of Cleveland. After about an hour, they left to visit one of appellant's friends at an RTA station nearby. Appellant and Goldwin then dropped appellant's friend and his girlfriend off at a nearby store and returned to Hodge's house. Around 8:00 p.m., they left Hodge's house, drove around for awhile and then went to a restaurant for carry-out food. After eating in the car, they drove to appellant's niece's house on the east side of Cleveland. Goldwin testified that after they had visited with the niece for about forty-five minutes, she asked appellant to take her home.
Appellant and Goldwin then drove to a park, where they walked around for approximately fifteen minutes. As they were walking back to the car, Goldwin told appellant to take her home. Rather than taking Goldwin home, however, appellant drove to an abandoned parking lot at 93rd and Quincy, near Goldwin's home.
Appellant ordered Goldwin to get out of the car. When Goldwin refused to do so, appellant got out of the car, came around to the passenger side of the car, opened the door, grabbed Goldwin by her arm and pulled her out of the car. Goldwin testified that appellant then opened the back passenger side door and pushed her in the car. Appellant said, "Bitch, take your clothes off," and when Goldwin refused to do so, he hit Goldwin in the face three times.
Goldwin testified that appellant then pulled at her belt. She pushed him away, but appellant pushed her down on her back in the back seat of the car. As appellant took his shirt and pants off, Goldwin tried to open the car door and get out. Appellant grabbed the door, however, and slammed it on Goldwin's head. Goldwin testified that she told appellant to stop, but he said, "No, I love you, that's why I'm doing this to you."
Goldwin testified that appellant pushed her back down and when she struggled as he unzipped her jeans, he hit her again in the face. Appellant then pulled Goldwin's clothes down and had sexual intercourse with her. After he finished, he put his clothes on and ordered Goldwin to put her clothes back on. Around 11:30 p.m., appellant drove Goldwin home. Before he dropped her off, he warned her not to tell anyone what had happened. Goldwin testified that she ran into her house and told her mother what had happened.
Sadie Goldwin, Gail's mother, testified that when Gail came in the house, her face was swollen and she was crying. As Gail was telling her mother what had happened, the telephone rang. When Sadie answered the phone, appellant, thinking Sadie was Gail, told her, "Gail, I didn't mean for it to go down like that." According to Gail, appellant kept calling her over the next two weeks but she refused to speak to him.
The next morning, Sadie accompanied Gail to St. Luke's Hospital for an examination. Officer Robert Petchler, a City of Cleveland Police Officer, testified that he interviewed Gail at St. Luke's Hospital. According to Petchler, she appeared "scared and upset."
Tracie Malone testified that in August 1997, she lived in the upstairs apartment of a two-story home. Her friend, Cinnamon Martinez, lived in the downstairs apartment. Malone did not have a telephone in her apartment so she used Martinez' phone.
Malone testified that she met appellant one day as she was walking home from the grocery store. She gave appellant Martinez' telephone number and appellant called her a few times during the next week. They eventually arranged a double-date for August 15. Appellant was to bring his cousin with him to accompany Malone's friend and Martinez' sister, Clecia, on the double-date.
Malone testified that appellant arrived at her house around 11:30 p.m. on August 15, 1997. Appellant's cousin was not with him. Nevertheless, Malone and Clecia accompanied appellant to a dance bar in The Flats. Malone testified that appellant did not want to dance, however, so she danced with another man that she met at the bar. Around 1:45 a.m., Malone told appellant she wanted to go home and they left the bar. Clecia, who had met an ex-boyfriend at the bar, did not accompany them.
Instead of heading west towards Malone's house, however, appellant drove east, claiming that he knew a short-cut. Appellant drove to a large truck-parking area off Lakeside Avenue. According to Malone, appellant was upset and told her that she had "disrespected" him by dancing with another man at the bar. He started touching her legs, but she pushed his hand away. Malone testified that she kept telling appellant to take her home and that she did not want to have sex with him because she did not know him.
Appellant got out of the car, came around to the passenger door, grabbed Malone's arms and pulled her out of the car. He then threw her in the back seat of the car. Malone testified that appellant sat on her, took her pants and underwear off and had sexual intercourse with her. When he was finished, he asked her if she wanted to go home.
Malone testified that she put her clothes back on as she was standing outside of the car and then ran into the parking lot toward the parking garage. As she was running, she saw two trucks driving toward her. She ran to one of the trucks and pounded on its passenger door, but the truck driver would not let her in.
Malone testified that the driver of the second truck let her in, drove her to the parking lot terminal and called an ambulance and the police. The police took Malone to St. Vincent's Hospital, where she was examined.
Malone testified that appellant called "constantly" after the incident, telling her that "he don't know what came over him" and he was sorry. Malone, who knew appellant only as "News," testified that she did not see appellant again until several days later, when she saw him in the arraignment room of the Justice Center, where he was being arraigned on Case No. CR-356000. Malone pointed appellant out to the police and he was arrested.
Cinnamon Martinez testified that she met appellant on August 15, 1997, when he picked up Malone and Clecia. Martinez testified that Malone called her at about 4:00 a.m. the next morning from the hospital and told her that appellant had raped her. Martinez testified that appellant called approximately seven times that day, each time wanting to speak with Malone. On one call, appellant told Martinez, "I'm sorry, Tracie made me mad, she disrespected me, she was dancing with another guy." On another call, Martinez heard Malone ask appellant, "why did you do this to me?" and then start sobbing. Martinez took the phone and heard appellant telling Malone that he was sorry and would make it up to her. According to Martinez, appellant called approximately twice a day in the week following the incident.
Robert Carter testified that he was the security guard on duty at Triton Trucking on August 15, 1997. Carter testified that at about 2:15 a.m., as he was driving down the hill from the main terminal of the lot, followed by another truck, he observed appellant and Malone standing outside of a car at the bottom of the hill. Carter testified that when he stopped his truck and opened the gate, Malone came over to him. Carter testified that appellant then walked over to where they were standing and grabbed Malone's arm. After Carter told appellant to let go of Malone's arm, Malone walked over to the other truck and began beating on the passenger door, asking to get in. The driver refused to let her in, however.
Carter testified that Malone then walked through the open gate of the parking lot and appellant walked after her. Carter observed appellant and Malone arguing, and heard Malone yell, "No. I'm not going with you. You raped me." After appellant left, Carter let Malone in his truck, took her back to the terminal and called 911.
Stewart Cathell testified that on August 15, 1997, at approximately 2:00 a.m., he went to Triton Trucking to pick up an empty trailer. He met with Carter at the terminal and then followed him in his truck down the hill to the truck parking lot. As they neared the bottom of the hill, Cathell observed appellant and Malone standing near a car. Cathell testified that Malone then came running over to his truck, yelling that she wanted to get in. Cathell did not let Malone in his truck but yelled at her that he would call the police.
Charles Neidbalson, a patrol officer with the City of Cleveland Police Department, testified that he was dispatched to Triton Trucking at approximately 3:25 a.m. on August 15, 1997. He met Malone there, whom he described as "pretty shaken." Officer Neidbalson and his partner interviewed Malone at the hospital.
Five witnesses testified for the defense. Mark Hodge, appellant's nephew, testified that he helped appellant paint Gail Goldwin's house and that he saw appellant and Goldwin together on several occasions after that. Hodge also testified that he "did drugs" with Tracie Malone once.
Brenda Nichols, appellant's sister, testified that appellant and Goldwin visited her home in late July or early August 1997. According to Nichols, appellant and Goldwin seemed to have a "friendly relationship."
Lee Honey, Nichols' boyfriend, similarly testified that appellant and Goldwin visited the house in late July or early August 1997. According to Honey, they stayed only fifteen minutes and then left.
Talia Allbright, appellant's niece, also testified that appellant and Goldwin visited the house two times. Allbright testified that Goldwin was laughing and having fun with appellant when she visited.
Michael Hoster, Talia's boyfriend, testified that he knew nothing about the case.
The trial court then instructed the jury and, prior to its deliberation, gave the jury a printed copy of the charge. On March 18, 1998, the jury returned a verdict of guilty on all charges.
On the morning of April 17, 1998, prior to the sentencing hearing, the trial court conducted a hearing, pursuant to R.C.2950.09, to determine whether appellant is a sexual predator. The trial court found that the state failed to prove by clear and convincing evidence that appellant is a sexual predator. The trial court concluded, however, that pursuant to R.C. 2950.01
(B), appellant is a sexually oriented offender.
The trial court then sentenced appellant to a term of eight years imprisonment on each of counts one and two in Case No. 356000 and eight years on each of counts one and two in Case No. 356946. The trial court ordered that the eight-year terms in each case be served concurrently, but ordered further that the sentence in Case No. 356946 be served consecutive to that imposed in Case No. 356000.
Appellant timely appealed, assigning six assignments of error for our review.
Appellant's first assignment of error states:
 I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO PRESERVE THE WRITTEN JURY INSTRUCTIONS PRESENTED TO APPELLANT NICHOLS' JURY AS PART OF THE RECORD FOR APPELLATE REVIEW.
In his first assignment of error, appellant contends that the trial court committed reversible error because it failed to comply with R.C. 2945.10 (G) when it submitted a copy of its jury instructions to the jury but did not preserve those instructions as part of the record. We do not agree.
The defendant is, of course, entitled to examine written instructions that the jury will have in its deliberations. Statev. Phillips (1995), 74 Ohio St.3d 72, 92. In State v. Schiebel
(1990), 55 Ohio St.3d 71, 85, the Ohio Supreme Court observed:
 A criminal defendant has a right to be aware of all communications with the jury, including any written jury instructions that are taken into the jury room for deliberations. Although those written instructions may only repeat earlier oral instructions, a defendant nevertheless must be allowed to inspect the written instructions to discover any omissions or discrepancies.
Because variations between the oral and written instructions may result in prejudicial error, R.C. 2945.10 (G) provides, in relevant part: "Written charges and instructions shall be taken by the jury in their retirement and returned with their verdict into court and remain on file with the papers of the case. * * *" Compliance with this statutory requirement allows the reviewing court to determine whether reversible error occurred, although the failure to keep the written charge on file with the papers of the case may be harmless error. See Crim.R. 52 (A).
Thus, in State v. Mills (Dec. 9, 1999), Cuyahoga App. No. 74700, this court held that the failure to include written instructions submitted to the jury in the record was harmless error where the state and defense counsel reviewed the court's proposed written instructions with the court in advance of the court's oral instructions and trial counsel did not identify any error in the written instructions or any deviation between the written instructions and the court's oral instructions and appellant did not assert that the written instructions submitted to the jury varied from those delivered orally by the court and recorded in the transcript of the proceedings.
Likewise, in the case at hand, we cannot say that the absence of the court's written instructions from the record is reversible error. First, both the state and defense counsel reviewed the jury charge with the court in advance of the court's oral charge and indicated their satisfaction with the charge.
Moreover, there is no indication that the oral charge and the written charge differed in any way. After the trial court had concluded its oral charge to the jury, both the prosecutor and defense counsel indicated that they were satisfied with the oral charge. The trial court responded:
 THE COURT: Good. The only alteration that I have to make —
MR. McCARTHY: Gail Goldwin.
 THE COURT: That is on the verdict forms. I don't think it is a significant problem especially given the defense consistently referred to her as Goodwin. But note there was an error or omission with respect to the charge as to counts to be considered separately so I will type that up myself and insert that. I read it from OJI and copied that into it.
 With that correction of the printed charge, I will give it to the jury and they can begin their deliberations.
MR. McCARTHY: Are you going to read it to them?
 THE COURT: I already read it. I didn't have it in the printed charge.
Thus, before giving the jury its written instructions, the trial court corrected the written instructions to include an instruction that the charges set forth in the indictment constituted separate and distinct matters and were to be considered separately, as charged in the oral charge. The separate verdict forms returned by the jury after their deliberations indicate that the jury properly considered each count separately.
Therefore, we hold that in this case, the trial court's failure to include the written instructions as part of the record is harmless error. We strongly emphasize, however, that the correct and best practice is for the trial court to always preserve the written jury instructions with the papers of the case, in full compliance with the requirements of R.C. 2945.10 (G).
Appellant's first assignment of error is overruled.
Appellant's second assignment of error states:
 II. THE APPELLANT WAS DENIED DUE PROCESS OF LAW UNDER BOTH THE OHIO AND UNITED STATES CONSTITUTIONS WHEN AN INCOMPLETE RECORD OF PROCEEDINGS WAS RECORDED IN THE TRIAL COURT.
In his second assignment of error, appellant contends that the record of the trial proceedings is incomplete. Appellant avers that his Crim.R. 29 motion for acquittal at the close of the state's case, his objections to certain of the state's exhibits and the testimony of Detective Howard, one of the state's witnesses, are missing from the record before this court. Therefore, appellant contends, it is impossible for him to evaluate the legality of the proceedings contained therein, thereby denying him due process of law. We disagree.
First, Detective Howard's testimony is not missing from the transcript. Rather, the record reflects that the court recessed for the day immediately after the state called Detective Howard to the stand. The next day, the state chose not to call Detective Howard to the stand and rested its case.
With respect to the other alleged omissions from the record, we note that appellant took no steps to correct the record, as he could have pursuant to App.R. 9 (E), by submitting to the trial court any changes he believed would better preserve his arguments for review.
Moreover, the failure to provide a complete transcript does not always deny a defendant an effective appeal. In State v. Depew
(1988), 38 Ohio St.3d 275, for example, parts of the trial proceedings could not be transcribed because the tapes were inaudible. Noting that the defendant had maintained only that the missing information "could be vital" to his case, the Ohio Supreme Court held that the failure to provide the entire transcript was not prejudicial because there was no indication that the defendant was denied effective appellate review as a result of the omissions. Id. at 279. See, also, State v. Tyler
(1990), 50 Ohio St.3d 24, 41; State v. Osborne (1976), 49 Ohio St.2d 135,142.
Likewise, in this case, although appellant points out several instances in the record where portions of the trial proceedings are allegedly unrecorded, he has not demonstrated any prejudice by the alleged inadequacy of the record. Rather, he makes only the general assertion that the missing discussions could possibly be a source of information that might lead to issues being raised on appeal. Furthermore, this court has carefully reviewed the record before it and finds it adequate for review.
Because there is no indication that appellant is denied effective appellate review as a result of the alleged omissions, we overrule appellant's second assignment of error.
Appellant's third assignment of error states:
 III. THE TRIAL COURT VIOLATED THE APPELLANT'S DUE PROCESS AS PROTECTED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10, TO THE OHIO CONSTITUTION WHEN IT HELD THAT INQUIRY INTO ALLEGED PROSTITUTION FELL WITHIN THE AUSPICES OF OHIO'S RAPE SHIELD STATUTE.
In his third assignment of error, appellant contends that the trial court erred in sustaining the state's objections to questions defense counsel asked of Tracie Malone and Mark Hodge.
Appellant argues that the trial court erroneously sustained the state's objections on two occasions: (1) on recross, when defense counsel asked Tracie Malone, "Did you ever ask Wallace for money for this sexual encounter?"; and 2) on direct examination of Mark Hodge, when defense counsel asked Hodge about the first time he allegedly met Malone. Hodge testified that he and appellant stopped at Malone's house one day. Defense counsel then asked Hodge:
Q. Did you expect to see Tracey at that time?
A. Yes, I did.
Q. Why didn't you see Tracey?
A. Because she supposed to been upstairs kicking it.
Q. What do you mean by kicking it?
 A. She supposed to been upstairs with somebody else or doing something at the time where there was no way that I could see her.
 Q. Did it come to your knowledge what Tracey was doing that was keeping her from keeping her appointment with you and your uncle Wallace?
MR. WALSH: Objection.
A. Yeah.
THE COURT: Overruled.
MR. WALSH: Objection. Can we approach the bench?
THE COURT: Yes.
The following discussion then occurred at sidebar:
MR. WALSH: Objection under the Rape Shield Statute.
MR. MAXTON: You're making an assumption.
MR. WALSH: Counsel is trying to get out —
MR. MAXTON: Turn a trick.
 MR. WALSH: — that she was having sex with somebody. Note our objection. That is where this is going.
THE COURT: Uh-huh.
MR. MAXTON: He's correct.
THE COURT: If he is correct, then sustained.
Appellant contends that the trial court erred in sustaining the state's objections because defense counsel's questions to Malone and Hodge are not prohibited by R.C. 2907.02 (D), Ohio's Rape Shield Statute.
R.C. 2907.02 (D) provides, in pertinent part:
 Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender * * *.
Thus, the rape shield statute essentially prohibits the introduction of any extrinsic evidence pertaining to the victim's sexual activity. The exceptions to this prohibition are evidence of the origin of semen, pregnancy, or disease, or of the victim's past sexual activity with the offender. In State v. Gardner
(1979), 59 Ohio St.2d 14-18, the Ohio Supreme Court set forth the major reasons behind the enactment of the rape shield law:
 * * * First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process.
The evidence that defense counsel attempted to elicit from Mark Hodge — that Malone was having sex with another man, for money, upstairs in her apartment as Hodge and appellant waited downstairs — is undeniably inadmissible under the rape shield law. Accordingly, the trial court properly sustained the state's objection to this line of questioning.
Counsel's question to Tracie Malone regarding whether she ever asked appellant for money for their sexual encounter is not barred, however, by the rape shield statute. Rather, the trial court properly sustained the state's objection because it was a new matter not raised in direct examination and therefore not a proper subject of recross.
Appellant's third assignment of error is therefore overruled.
Appellant's fourth assignment of error states:
 V. THE TRIAL COURT ERRED WHEN IT SENTENCED THE APPELLANT TO CONSECUTIVE SENTENCES WHEN IT FAILED TO MAKE THE FINDINGS REQUIRED BY R.C. 2929.14 (E)(4).
In his fourth assignment of error, appellant argues that the trial court erred in imposing consecutive sentences without following the statutory mandates for imposing consecutive sentences set forth in R.C. 2929.14 (E).
R.C. 2929.14 (E)(4) provides in pertinent part:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
Thus, pursuant to R.C. 2929.14 (E)(4), the trial court may impose consecutive prison terms for convictions of multiple offenses upon the making of certain findings enumerated in the statute. Moreover, under R.C. 2929.19 (B)(2)(c), if the trial court imposes consecutive sentences, it must make a finding on the record that gives its reason for imposing consecutive sentences.
Here, the trial court did not make the necessary findings on the record to satisfy the criteria imposed by R.C. 2929.14
(E)(4). It is not enough, as the state argues, that before imposing the consecutive sentences, the trial court informed appellant that "these are very serious offenses. Your record does not help you. The impact upon the victims is severe. The impact upon society is severe." Rather, as is apparent from the statutory language of R.C. 2929.14 (E)(4) and 2929.19 (B)(2)(c), the trial court must make a record at the sentencing hearing that confirms that the trial court's decision-making process included all of the statutorily required sentencing considerations. SeeState v. Edmonson (1999), 86 Ohio St.3d 324.
Appellant's fourth assignment of error is well-taken. The sentence imposed by the trial court is vacated and this cause is remanded to the trial court for re-sentencing in accordance with our opinion.
Appellant's fifth assignment of error states:
 V. THE TRIAL COURT ERRED WHEN IT CLASSIFIED THE APPELLANT AS A "SEXUAL PREDATOR" BECAUSE THE LABEL IS UNREASONABLE OR ARBITRARY IN VIOLATION OF SECTION 1 AND 2 OF ARTICLE I OF THE OHIO CONSTITUTION.
In his fifth assignment of error, appellant asks this court to follow the reasoning and holding of State v. Williams (Jan. 29, 1999), Lake App. No. 97-L-191, unreported. This court has repeatedly declined to adopt the reasoning of the Lake County decision. See State v. Wynn (Dec. 2, 1999), Cuyahoga App. No. 75281, unreported; State v. Casper (June 10, 1999), Cuyahoga App. Nos. 73061, 73062, 73064, unreported; State v. Sarli (June 3, 1999), Cuyahoga App. No. 74292, unreported; State v. Hart (Mar. 18, 1999), Cuyahoga App. No. 73375, unreported; State v. Souers
(Mar. 11, 1999), Cuyahoga App. No. 72660, unreported; State v.Eppinger (Mar. 11, 1999), Cuyahoga App. No. 72686, unreported.
Appellant's fifth assignment of error is therefore overruled.
Appellant's sixth assignment of error states:
 VI. THE TRIAL COURT ERRED WHEN IT EXECUTED AN ORDER STATING THAT THE APPELLANT "PLEAD GUILTY" ON CR-356000 WHEN HE WAS FOUND GUILTY BY A JURY.
In his sixth assignment of error, appellant argues that the trial court erred when it entered an order dated April 21, 1998 in CR-356000 stating that appellant "plead guilty" to kidnapping and rape as charged in the indictment and sentencing him to a prison term of eight years on each count. Appellant requests that we reverse and remand on the basis of this typographical error.
Although appellant's assignment of error has merit, we will not reverse and remand a matter for correction of a clerical error. Rather, in light of our disposition of appellant's fourth assignment of error, the trial court is directed, upon remand, to issue a sentencing order in CR-356000 that comports with the proceedings in this matter and indicates that appellant was found guilty by a jury of kidnapping, in violation of R.C. 2905.01, and rape, in violation of R.C. 2907.02.
It is ordered that appellant and appellee equally share the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for re-sentencing.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JUDGMENT: CONVICTION AFFIRMED; SENTENCE VACATED AND REMANDED FOR RE-SENTENCING.
___________________________ TIMOTHY E. McMONAGLE JUDGE
DIANE KARPINSKI, P.J. and MICHAEL J. CORRIGAN. J., CONCUR.