DECISION
A Franklin County Court of Common Pleas jury found defendant-appellant, Bernard McClaney, guilty of one count of murder, one count of aggravated murder, and one count of aggravated robbery; as to each count the jury also found a firearm specification. Subsequently, the jury unanimously found that appellant should be sentenced to life without parole for the aggravated murder. The trial court sentenced appellant to life with an additional consecutive three years incarceration for the use of a firearm in Count 1, life without the possibility of parole with an additional consecutive three years actual incarceration for the use of a firearm in Count 2, and ten years with an additional consecutive three years actual incarceration for the use of a firearm in Count 3; the sentences were to be served concurrently. Appellant appeals his conviction and presents the following assignments of error:
 ASSIGNMENT OF ERROR NO. 1 THE TRIAL COURT ERRED WHEN IT OVERRULED THE APPELLANT'S OBJECTION TO THE PROSECUTION'S PEREMPTORY CHALLENGE THAT REMOVED THE ONLY PROSPECTIVE AFRICAN-AMERICAN JUROR FROM THE JURY THEREBY VIOLATING THE EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION THAT PROHIBITS PURPOSEFUL DISCRIMINATION BY THE PROSECUTION IN THE EXERCISE OF ITS PEREMPTORY CHALLENGES TO EXCLUDE MINORITY GROUPS FROM SERVICE ON A JURY.
 ASSIGNMENT OF ERROR NO. 2 THE APPELLANT'S CONVICTIONS FOR AGGRAVATED MURDER, MURDER, AND AGGRAVATED ROBBERY ALONG WITH THE ACCOMPANYING SPECIFICATIONS ARE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE REVERSED AS AGAINST THE RIGHT OF THE APPELLANT TO DUE PROCESS OF LAW UNDER THE OHIO AND FEDERAL CONSTITUTIONS.
 ASSIGNMENT OF ERROR NO. 3 THE TRIAL COURT ERRED WHEN IT PREVENTED APPELLANT'S TRIAL COUNSEL FROM EFFECTIVELY CROSS EXAMINING A KEY PROSECUTION WITNESS REGARDING ISSUES RELATING SPECIFICALLY TO HIS CREDIBILITY AND ABOUT SPECIFIC INSTANCES OF CONDUCT PROBATIVE OF TRUTHFULNESS AND UNTRUTHFULNESS.
 ASSIGNMENT OF ERROR NO. 4 THE TRIAL COURT ERRED WHEN IT ADMITTED ALL THE PROSECUTION'S EVIDENCE FROM THE TRIAL PHASE INCLUDING EVIDENCE NOT RELEVANT TO THE SENTENCING ISSUE INTO THE SENTENCING PHASE OF THE PROCEEDINGS.
In his first assignment of error, appellant asserts that the trial court erroneously accepted the prosecution's race-neutral explanation for exercising a peremptory challenge to remove the only remaining African-American from the jury venire. The transcript indicates that at least one other African-American was in the jury venire, but she was related to one of the prosecutors and was excused for cause. (Tr. 217.)
In Batson v. Kentucky (1986), 476 U.S. 79, the United States Supreme Court held that the Equal Protection Clause forbids the state from exercising peremptory challenges to exclude jurors solely on account of their race. Id. at 89. To establish a primafacie case of purposeful discrimination, a "defendant must demonstrate (1) that members of a cognizable racial group were peremptorily challenged, and (2) that the facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race." State v. Johnson (2000), 88 Ohio St.3d 95, 116.
Once a defendant establishes a prima facie case of discrimination, the state "must give a `clear and reasonably specific' explanation of his `legitimate reasons' for exercising the challenges." Batson, fn. 20. "Legitimate reasons" refers to a reason that does not deny equal protection, which in a Batson
context is a race-neutral explanation. Purkett v. Elem (1995),514 U.S. 765, 768-769; Batson, at 97-98. The trial court must then determine whether the defendant has established purposeful discrimination. Batson, at 98. It is at this latter point that the persuasiveness of the state's justification becomes relevant: if the court finds the justification fantastic or implausible, it may find the justification a pretext for purposeful discrimination. Purkett, at 768.
On appeal, the reviewing court's concern is whether the trial court's finding of no racial motive is fairly supported by the record. In turn, the genuineness, not the reasonableness, of the race-neutral explanation is the proper focus. Purkett, at 769.
The credibility of a prosecutor's race-neutral explanation for exercising a peremptory challenge will typically be the decisive question. Hernandez v. New York (1991),500 U.S. 352, 365. Because the demeanor of the prosecutor who exercises the challenge will often be the best evidence of the prosecutor's credibility, evaluating a "prosecutor's state of mind based on demeanor and credibility lies `peculiarly within a trial judge's province.'" Id.
Thus, a trial court's finding on the question of discriminatory intent should receive great deference from reviewing courts. Hernandez, at 364. Accordingly, a trial court's finding of no discriminatory intent will not be reversed absent a determination that it was clearly erroneous. Johnson, at 116. "Clearly erroneous" intends a decision "`so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process,' * * * or equal protection." Hernandez, at 368. Consequently, unless an appellate court, based upon a review of the entire record, is left with a definite and firm conviction that the trial court made a mistake, the trial court's finding of no discriminatory intent will be accepted. Hernandez, at 369.
The defense contested the prosecution's use of a peremptory challenge to excuse Sammie Williams, the only remaining African-American member of the venire, on the basis that appellant was African-American and it would not be proper to have an all white jury hear appellant's case. The trial court instructed the prosecutor to articulate his reasons, and the prosecutor provided the following explanation:
 MR. KRAPENC: The reason for excusing this guy is that questions, or his responses to the death-penalty questions in the first voir dire indicated that he's only going to consider the death penalty in the most heinous of situations.
 What we have here is an aggravated robbery, aggravated murder. He's never he's never, ever going to fully unequivocally consider the aggravating circumstances in this case, never going to get to the death, and had his answer as all jurors on a scale of one- through-five. He's the one that I put at one that's come up. I puts [sic] it, just purely on his answer of the death qualifications part. [Tr. Vol. II, 215-216.]
The trial court determined that there was no discriminatory intent and overruled appellant's pretrial motion seeking a ruling that the state could not use peremptory challenges on jurors who came close to being challenged for cause on the death penalty.
The trial transcript reveals the following pertinent voir dire of Williams:
MR. KRAPENC: Okay. Mr. Williams?
PROSPECTIVE JUROR NO 4: Uh-huh.
 MR. KRAPENC: When you got your summons to show up, did you know it was for an aggravated murder trial?
PROSPECTIVE JUROR NO 4: I didn't know what it was.
 MR. KRAPENC: Did you know we were going to ask you about the death penalty?
PROSPECTIVE JUROR NO 4: No.
 MR. KRAPENC: Have you had time to think about it just a little bit?
 PROSPECTIVE JUROR NO 4: Yes, sir. Well, me and my wife talks about it, and basically I don't know. I could say I could or I couldn't right now, because I don't really know what the basis of the crime or whatever was committed or how it was committed or nothing like that. I don't know I would have to make this decision after, you know, hearing everything.
MR. KRAPENC: Sure.
 PROSPECTIVE JUROR NO 4: I'm not saying I'm basically going out there for it, but I'm not saying I'm against it either, because there's times when it really is necessary.
 MR. KRAPENC: Let me ask you this: If you had your own country, the country, Mr. Williams, is yours; you are the ruler of the country, king or president or whatever you want to be, and you got the chance to make all the laws of that country, would you have a death penalty as a possible penalty?
PROSPECTIVE JUROR NO 4: Sure.
 MR. KRAPENC: Would you include in that law that if you commit a certain crime and it's proved, the death penalty is an option?
PROSPECTIVE JUROR NO 4: Yes, sir.
 MR. KRAPENC: Okay. Well, let's say you get to the second phase, you and 11 other jurors have found this man guilty of intentionally taking the life of another while committing an aggravated robbery, and you found that there were no mitigating factors or very little mitigating factors, what would your sentence be?
 PROSPECTIVE JUROR NO 4: Well, I could say yes, it's between life in prison and death.
 MR. KRAPENC: Okay. By law, if you find these aggravating circumstances outweigh those mitigating factors, it would require a death verdict. Can you do that?
PROSPECTIVE JUROR NO 4: Yes, I could.
MR. KRAPENC: Okay.
PROSPECTIVE JUROR NO 4: But
 MR. KRAPENC: I heard a "but." Okay. Mr. Williams, I probably should have said this sooner. I'm not asking you folks to commit to any sentence.
PROSPECTIVE JUROR NO 4: I understand.
 MR. KRAPENC: I'm not going to ask you to promise what you're going to do in this case. I need to know whether you can follow the law in the case and, based on this balancing test, then decide what it should be; but some people are leaning one way or the other before they have even heard facts.
 PROSPECTIVE JUROR NO 4: Like you just said, 51-49 or that makes a big difference right there. And whether it's life or death. You said it's like a football game or whatever. But it's not like a football game.
 MR. KRAPENC: In other words, you want the aggravating circumstances to really outweigh the mitigating factors?
 PROSPECTIVE JUROR NO 4: Afterwards, you know, all the losers are going home, you know, but this guy's not.
 MR. KRAPENC: But the law says that the aggravating circumstances, if they outweigh the mitigating factors, and it doesn't say how much they have to do it, they just have to outweigh it beyond a reasonable doubt. So you want a score of about 60-40?
 PROSPECTIVE JUROR NO 4: I'm not saying I would consider the death penalty.
MR. KRAPENC: Okay. All right. [Tr. Vol. I, 78-82.]
Appellant asserts that the prosecutor's explanation was a pretext for excluding Williams due to his race, and disputes appellee's claim that Williams indicated he would only consider the death penalty in the most heinous of situations. Appellant contends that Williams' comments were simply correct observations of the law that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt before the death penalty may be imposed.
As further support for his pretext claim, appellant argues that two white jurors, Dora Sterling and Kelly Hoover, expressed comparable, if not greater, reservations about the death penalty than Williams, yet were not challenged and served on the jury. Specifically, Sterling stated she would prefer that the death penalty not be the law, but she could accept it. Sterling stated she would be able to give full and proper consideration to the death penalty as a possible sentence and could sign a form indicating her decision if it was for death. Hoover expressed reservations about imposing the death penalty and the need to be positive there were no mitigating factors; however, after hedging, ultimately acknowledged that, if she found beyond a reasonable doubt that the aggravating circumstances outweighed any mitigating factors, she could sign a death penalty verdict.
Appellee counters that Williams indicated he would not necessarily be able to follow the law and impose the death penalty if aggravating circumstances outweighed mitigating factors, instead the most he would commit to was to consider imposing the death penalty in such a situation. Appellee contrasts Williams' statements with those of Sterling and Hoover who both, despite expressing reservations about the death penalty, ultimately stated they would follow the law and sign a death verdict if the aggravating circumstances outweighed any mitigating factors.
When the prosecutor cites particular answers of an African-American juror to justify exercising a peremptory challenge against the juror, but did not challenge a Caucasian juror who provided a similar answer, such disparate treatment weighs heavily against the legitimacy of the race-neutral explanation. State v. Belcher (1993), 89 Ohio App.3d 24, 33-34.
This court does not understand Williams' statements about the death penalty to be as equivocal as did the prosecutor. Williams appeared uncomfortable with the prosecutor's example in which a death penalty verdict is required if the jury found beyond a reasonable doubt that aggravating circumstances outweighed mitigating factors by as narrow a margin as fifty-one to forty-nine percent. Although this scenario may be correct, it depicts an unrealistic scenario. Williams' reluctance to impose a death penalty sentence in that situation does not warrant a conclusion that Williams would under no circumstances have considered the death penalty in appellant's case. In fact, Williams specifically stated he would consider the death penalty and he could impose it. Nor does this court find Williams' statements substantially different from those of Sterling and Hoover, neither of whom were asked about the fifty-one to forty-nine percent scenario.
While this court recognizes that the trial court personally observed the demeanor of the prospective jurors and the prosecutor; we cannot definitely say that the prosecutor's explanation was genuine, but conclude it was a pretext particularly when comparing Williams' responses with those of Sterling and Hoover who were not challenged. The trial court clearly erred when it found the proffered explanation to be race-neutral.
For the above reasons, appellant's first assignment of error is sustained.
In his second assignment of error, appellant asserts that his convictions for aggravated murder, murder, aggravated robbery and the accompanying specifications are against the manifest weight of the evidence.
A conviction supported by sufficient evidence may be reversed on appeal if the reviewing court concludes that the conviction is against the manifest weight of the evidence. Statev. Thompkins (1997), 78 Ohio St.3d 380, 387. When a reviewing court reverses a trial court's judgment on the basis that the verdict is against the manifest weight of the evidence, the reviewing court has effectively considered the evidence from the position of a thirteenth juror and disagreed with the fact finder's resolution of conflicting testimony. Id. A trial court's judgment should be reversed on manifest weight grounds only in exceptional circumstances when the evidence weighs heavily against conviction. State v. Martin (1983), 20 Ohio App.3d 172,175.
On the evening of Monday, April 27, 1998, Columbus police were called to the apartment of Kemrick, aka Ricardo, Drake at 341 1/2 E. 11th Avenue in Columbus, Ohio. The call was made by a concerned friend of Drake after he had crawled up to look in Drake's apartment window. After forcing open the locked door to Drake's apartment, the police discovered Drake's body on a couch. Drake had died from a single gunshot wound to his head. During their search of the apartment, the police recovered a spent .380 shell casing underneath the couch.
On Saturday, April 25, 1998, Kenisha Fields, the mother of Drake's young son, and Drake made plans to take their son to church the next day; Fields was to call Drake in the morning to wake him up. Fields testified that, although they did not live together, she saw Drake almost daily.
On the afternoon of April 25, 1998, Angelo Grey, who lived at 365 E. 11th Avenue, socialized on a neighbor's porch with appellant, Drake, and two neighbors. Grey heard appellant ask Drake several times for a ride to Indiana or, alternatively, to borrow Drake's truck in exchange for money; however, Drake consistently denied the requests. Grey saw a .380 handgun at appellant's waist under his shirt; Grey had previously seen appellant with this gun. Grey left for awhile and never saw Drake again.
On Saturday, April 25, 1998, Misty Earley was visiting her friend Shayla Wolverton, who was living on E. 8th Avenue. Saturday evening, while walking down an alley on their way to a club, Misty and Shayla ran into Drake and appellant, who was introduced as Cain. Misty had never met either man. Shayla met appellant for the first time in the alley, but knew Drake. Shayla testified that she and Drake had an on-again off-again relationship from July 1997 until April 1998. While they were talking in the alley, Misty and Shayla saw appellant hold a gun out in front of him. At around 10 or 11 p.m., the four of them went to Drake's apartment where they drank and smoked marijuana. Drake told Misty of his plans to take his son to church the next morning. Shayla observed appellant "messing" with Drake's possessions and heard him say that Drake had nice things. Shayla also heard Drake refuse appellant's request to borrow Drake's truck. Misty and Shayla saw the gun again when Shayla unknowingly sat on it when she sat in a chair previously occupied by appellant. Appellant retrieved the gun and put it down after removing the clip. At some point, Shayla and Drake went into the bedroom together for awhile and engaged in sexual intercourse. During this time, Misty and appellant also engaged in sexual intercourse on the living room couch. No one else came to Drake's apartment while Misty and Shayla were there. Misty and Shayla left the apartment around 3:50 a.m. Misty and Shayla both saw a vehicle they identified as Drake's Explorer parked on the street in front of the apartment when they left. Shayla never saw Drake again.
Misty did not see anyone she recognized as Cain in the courtroom. Shayla made an in-court identification of appellant as Cain.
When Fields called Drake on Sunday, April 26, 1998, around 7 or 8 a.m., he did not answer the phone; Fields called several times and got no answer. In the afternoon after church, Fields went to Drake's apartment but got no answer; she also looked unsuccessfully around the neighborhood for his Explorer, which was not parked in front of his apartment, but did not find it. Fields testified that Drake had purchased a white Ford Explorer in January or February of that year, and she was the only other person he let drive it.
William Gillette, a Columbus homicide detective, was the lead investigator of Drake's murder. Gillette learned that appellant may have been at Drake's apartment on the day of Drake's murder and that Drake's Explorer, which was always parked in front of his building, was missing. Gillette obtained a Fort Wayne, Indiana address for appellant and sent the Fort Wayne police data on the missing Explorer. On May 5, 1998, the Fort Wayne police informed Gillette that they had appellant in custody. At the time of his arrest in Indiana, appellant had a Morona wristwatch which Fields subsequently identified as a gift she had given to Drake. Gillette traveled to Fort Wayne on May 6, 1998, where he conducted an audio-tape-recorded interview of appellant. On July 29, 1998, Gillette conducted a second interview of appellant who was now in Columbus, this interview was video taped. Both the audio and video taped interviews were played to the jury at trial.
John Pitzen testified at appellant's trial that he and appellant had been cellmates in the Allen County (Indiana) jail in May 1998. According to Pitzen, appellant told him about his case. Appellant told Pitzen that he told the police there were two different sets of girls at Drake's apartment and that he left Drake's before the second set of girls when, in reality, there was only one set of two girls who left around 3 a.m. Appellant also insinuated that he and Drake engaged in sexual intercourse with the two girls. Drake woke appellant around 6:30 a.m., because he needed to take his son to church. Appellant went into the bathroom, came out of the bathroom, and shot Drake with a .380 once in the head. Appellant then rummaged through Drake's clothes, took Drake's watch from him, ate breakfast, wiped the apartment door, and left. After leaving the apartment, appellant picked up a friend and they drove to Fort Wayne; at some point they disassembled the gun and threw it off a bridge trestle.
Pitzen testified that he took appellant's story to the authorities because it was the right thing to do and because he hoped to get some help with his sentence on his pending forgery charges. Pitzen denied reading about the case in the newspaper and stated that all of his knowledge came from appellant. Pitzen acknowledged that, during their first meeting, he repeatedly asked what Gillette would do for him. Gillette testified that he telephoned the Allen County Prosecutor regarding Pitzen's pending forgery charges.
Pitzen was also cooperating with authorities and providing information about another cellmate, John Farris, who Pitzen believed was suspected of armed robbery and unrelated murder charges. Pitzen hoped that his cooperation in Farris' case would get him a lighter sentence. At the time of appellant's trial, Farris' trial was still pending.
Pitzen testified that his only felony convictions are for forgery, his cooperation reduced his sentence by one year and he was scheduled to be released at midnight on the day he testified.
John Farris testified as a witness for the defense. Farris testified that he had murder charges pending against him in Fort Wayne and had previously served time for drug offenses. Farris testified that he had been cellmates with Pitzen in the Allen County jail for a few months and that Pitzen told him appellant actually did not confess to him, but Pitzen put together his story from the newspaper and from pictures of the crime scene that Gillette showed him. Farris denied knowing that Pitzen had information about Farris' pending case and was scheduled to testify against him. Farris also denied that he was testifying in the present case in an effort to make Pitzen look like a liar and, thus, hurt his credibility at Farris' trial.
The last witness to testify was Deana Turner. Turner lives in the apartment building next door to Drake's building. She testified that, on the morning of Monday, April 27, 1998, she saw a man and a woman leave Drake's apartment in a hurry and did not see them lock the door behind them.
Drake's apartment was located on the second floor of a two-story apartment building. The only door to Drake's apartment was an outside door on the first level that opened into a stairwell, the actual living area of the apartment was at the top of the stairs. The apartment building had six doors grouped in three pairs and all painted the same color green. In each pair of doors, one door led to an upstairs apartment and the other to a first floor apartment. The doors had to be locked with a key, and Drake possessed the only set of keys to his apartment.
In support of his manifest weight argument, appellant alleges that the prosecution's evidence lacks credibility and, at best, weakly implicates him. Notably, appellant contends that Pitzen's testimony is not believable, that no evidence directly links him to the murder, and that Turner's testimony established that appellant was not the last person in Drake's apartment before his murder was discovered.
As support for his claim that Pitzen's testimony lacks credibility, appellant cites to Pitzen's record of dishonesty, his desire and repeated attempts to reduce his prison term by informing on cellmates, and John Farris' testimony that Pitzen claimed to have framed appellant. The jury personally observed Pitzen and Farris, heard their testimony, and believed Pitzen over Farris. This finding is not against the manifest weight of the evidence, especially in light of Farris' pending murder charges and his motive in discrediting Pitzen who was scheduled to testify against Farris.
Nor is Pitzen's testimony the only evidence connecting appellant to the murder. Appellant was in possession of Drake's Explorer, clothes, and watch. Appellant's explanation that they often traded clothes was not very persuasive, as Gillette noted in the video taped July interview session, the police found no clothes at all in Drake's apartment. Nor is it plausible that Drake let appellant borrow his vehicle when he planned to go to church in the morning or lent his watch to appellant to ensure that he returned on time. In addition to Fields' testimony that Drake did not let others drive his Explorer, Grey and Wolverton both heard Drake repeatedly and consistently refuse appellant's requests to borrow the vehicle. Finally, appellant was seen in possession of a .380 gun on April 25, 1998, the day Drake was last seen alive, and a .380 shell was recovered under the couch where Drake's body was discovered.
The prosecution established a sufficient basis for the jury to conclude that Turner could have been mistaken in her belief that she saw two people leave Drake's apartment the day his body was discovered. Notably, Turner did not see the couple lock the door behind them but, when the police were called to the scene, the door was locked. Additionally, because the entrances to the apartments were close to one another, Turner could have mistakenly believed that people leaving the first floor apartment were leaving the second floor apartment.
Contrary to appellant's argument, the prosecution's failure to introduce blood or trace evidence of any kind connecting appellant to the shooting or evidence establishing the time of the murder or the size and weight of the bullet does not diminish the weight of the evidence the state introduced against appellant. Although evidence of this nature consistent with the prosecution's theory of guilt against appellant would have strengthened the prosecution's case, its introduction was not essential to sustain a connection.
Accordingly, this court finds that the prosecution's evidence was sufficiently credible, such that the jury did not clearly lose its way when it found appellant guilty of the aggravated murder, murder and aggravated robbery of Drake and the conviction is not against the manifest weight of the evidence.
For the above reasons, appellant's second assignment of error is overruled.
In his third assignment of error, appellant asserts that the trial court erred when it prevented defense counsel from cross-examining Angelo Grey about an issue pertaining to his credibility. Specifically, the court did not permit defense counsel to cross-examine Grey, who was then under indictment on a robbery charge but out on bond, about his ability to post a $50,000 surety bond two weeks after signing an affidavit of indigency. Grey testified that his mother had provided the bond money. Citing the time lapse between Grey signing the affidavit of indigency and the absence of evidence that Grey posted the bond money, the court ruled that Grey could not be cross-examined on the point.
Evid.R. 608(B) provides in part: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, * * * may, * * * in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness." A trial court's ruling on the admissibility of evidence will not be overruled absent a clear abuse of discretion that materially prejudiced the appellant. State v. Hymore (1967), 9 Ohio St.2d 122, 128.
Appellant cites State v. Greer (1988), 39 Ohio St.3d 236, in which the Ohio Supreme Court likened a parole violation to a failure to keep a promise, and concluded that it was almost always probative evidence of a witness's character for truthfulness. Id. at 243. Citing Evid.R. 608(B), the court held that a parole violation was an appropriate subject for impeachment-oriented cross-examination. Appellant argues that, when Grey signed the affidavit of indigency, he promised to tell the court if his finances changed and that his failure to tell the court that his financial status had changed was a failure to keep his word analogous to a parole violation.
Unlike Greer, in which the witness had been found to have violated a promise by the court, Grey was simply accused by appellant's defense counsel of violating a promise. No official finding of a violation had been made, rather, defense counsel apparently presumed that, because Grey posted bond, he was not truly indigent. As the trial court noted, there was no evidence that Grey's finances had improved. In light of the absence of a judicial determination that Grey violated the terms of his affidavit of indigency, the defense lacked evidence that was clearly probative of Grey's truthfulness or untruthfulness and the trial court did not abuse its discretion.
Accordingly, appellant's third assignment of error is overruled.
In his fourth assignment of error, appellant asserts that the trial court erred when it admitted all the prosecution's evidence from the guilt finding phase into the sentencing phase of the proceedings. Specifically, defense counsel objected to any photographs of the decedent being readmitted into the penalty phase of appellant's trial. Defense counsel argued that the murder itself was not an aggravating circumstance, and that it would be inflammatory and prejudicial for the jury to review the photographs. The state argued that the photographs were relevant evidence to the fact that the victim was intentionally killed during the course of an aggravated robbery. The court found nothing particularly inflammatory about any of the photographs and overruled the defense's motion to preclude the readmission.
Subject to the rules of evidence, "evidence raised at trial that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty, [or] any other testimony or evidence relevant to the nature and circumstances of the aggravating circumstances specified in the indictment of which the defendant was found guilty" may be introduced at the penalty stage of a capital trial pursuant to R.C. 2929.03(D)(1) and (2). State v. Gumm (1995), 73 Ohio St.3d 413, syllabus. (Construing R.C. 2929.03(D); affirming and following State v. DePew (1988), 38 Ohio St.3d 275.)
In DePew, the court found the photographs of bodies at the crime scene and autopsy photographs admitted into evidence were relevant to the cause of death and the killer's purpose to cause death. Thus, pursuant to R.C. 2929.03(D)(1), the court upheld the submission of the photographs in the penalty phase because they were relevant to the aggravating circumstances the defendant had been found guilty of committing. Id. at 281-283. In so doing, the court acknowledged that its application of2929.03(D)(1) "appears to permit repetition of much or all that occurred during the guilt stage, nevertheless, a literal reading * * * mandates such a result." Id. at 283.
Based upon the Ohio Supreme Court's consistent reliance on the language of R.C. 2929.03(D)(1) to uphold the readmission of photographs of murder victims to the jury in the penalty phase of a capital case, see, e.g., State v. Fears (1999), 86 Ohio St.3d 329,345-346; State v. Lindsey (2000), 87 Ohio St.3d 479, 485, this court finds no abuse of discretion by the trial court in the present case.
For the above reasons, appellant's fourth assignment of error is overruled.
Appellant's first assignment of error is sustained, appellant's second, third and fourth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded for further proceedings in accordance with this decision.
 ________________ BOWMAN, P.J.
KENNEDY and KLINE, JJ., concur.
KLINE, J., of the Fourth Appellate District, sitting by assignment in the Tenth Appellate District.